UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROLLER BEARING COMPANY OF AMERICA, INC., | : |
| Plaintiff, | : |
| | : |
| | : |
| v. | : |
| | : C.A. NO. |
| RAYTHEON TECHNOLOGIES | : |
| CORPORATION F/K/A RAYTHEON | : |
| COMPANY, | : |
| Defendant. | : |
| | : |

**COMPLAINT AND JURY DEMAND**

Plaintiff ROLLER BEARING COMPANY OF AMERICA, INC. ("RBC" or "Plaintiff"),

by and through its undersigned attorneys, alleges the following as and for its Complaint against

Defendant RAYTHEON TECHNOLOGIES CORPORATION (f/k/a RAYTHEON COMPANY)

("Raytheon").

**NATURE OF THE ACTION**

1.     RBC designs, manufactures and distributes highly engineered products and

bearings to the aerospace industry, including products and bearings utilized in products made for

government contracts for the United States Department of Defense.  RBC brings this lawsuit

against Raytheon on the grounds that it breached a nondisclosure agreement with RBC and

misappropriated RBC's trade secrets in violation of state and federal law.  More particularly,

Raytheon had access to trade secrets and proprietary information of RBC – namely, its novel and

proprietary design and specifications for a rod end bearing and bushing to be employed in

munitions manufactured by Raytheon.  Raytheon distributed RBC's trade secrets and proprietary

information to a third party, Multicut Denmark A/S ("Multicut Denmark"), without informing

1

Multicut Denmark that the information was the property of RBC and without taking proper steps, under the nondisclosure agreement with RBC, to ensure that Multicut Denmark did not further disseminate the information without proper protections in place.  Raytheon further asserted ownership over RBC's trade secrets and proprietary information and expressly authorized Multicut Denmark to disseminate the information without limitation or protection.  Multicut Denmark thereafter disseminated the information to its wholly-owned North American subsidiary, Multicut North America, Inc. ("MNA"),[1] and to RBC's competitors, causing RBC to suffer financial injury.

2.      RBC asserts claims against Raytheon for monetary damages based on Raytheon's breach of  contract, violation of the federal Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. §§ 1831 *et seq*., misappropriation of RBC's trade secrets and proprietary and confidential information in violation of Massachusetts common law and statutory law, M.G.L. c. 93, § 42, *et. seq*., and breach of the covenant of good faith and fair dealing.  RBC also seeks a declaratory judgment and injunctive relief against Raytheon.

## PARTIES

3.      RBC is a corporation organized under the laws of Delaware with its principal place of business located in Oxford, Connecticut.

4.      Raytheon is a corporation organized under the laws of Delaware with its principal place of business located in Waltham, Massachusetts.

---

[1] RBC has filed a separate action against MNA for misappropriating RBC's trade secrets in violation of state and federal law in the United States District Court for the District of Connecticut entitled Roller Bearing Company of America, Inc. v. Multicut North America, Inc., 3:18-CV-1212 (SRU) (the "MNA Action"). RBC intends to file, contemporaneously herewith, claims against Multicut Denmark in the District of Connecticut.

## JURISDICTION AND VENUE

5.      This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331, and pursuant to the federal DTSA, which provides RBC with a private right of action to assert its claims against Raytheon in the federal courts of the United States.

6.      This Court may exercise personal jurisdiction over Raytheon pursuant to M.G.L. c. 223A, § 2, as Raytheon has its principal place of business in Waltham, Massachusetts. This Court may also exercise personal jurisdiction over Raytheon pursuant to a contractual agreement with RBC whereby Raytheon agreed to submit to the exclusive jurisdiction of courts in the Commonwealth of Massachusetts with respect to any claim, controversy or dispute arising out of or in connection with the Agreement.

7.      Venue is proper in this District, pursuant to 28 U.S.C. § 1391(b), because, as set forth above, Raytheon entered a contractual agreement with RBC, whereby Raytheon contractually agreed that venue for claims would be proper in the courts in the Commonwealth of Massachusetts.

## BACKGROUND

8.      As set forth above, RBC is in the business of designing, manufacturing and distributing highly engineered products and bearings to the aerospace industry, some of which are utilized in government contracts, including the proprietary rod end bearing and bushings that are the subject of this dispute.

9.      Heim, a division of RBC, is an operating and manufacturing plant located in Fairfield, Connecticut, where the component parts that are the subject of this Complaint are manufactured and assembled.

10.     Raytheon is a global corporation serving customers in the commercial aerospace and defense industries.  Among other things, Raytheon produces advanced technologies, including air and missile defense systems, precision weapons, radars, and command and control systems.

### Raytheon NDA with RBC and Development of Trade Secrets

11.     In or about 2014, Raytheon commenced preliminary negotiations with RBC for a proposed transaction whereby RBC would be a supplier for manufactured parts used in a project known as the Small Diameter Bomb II project (herein after "SDB II").

12.     On information and belief, the SDB II is a U.S. military project which requires use of rod end bearings and associated bushings, along with other parts, for the wing assembly to be installed in guided munitions launched by an aircraft.

13.     In furtherance of the above-proposed transaction, Raytheon entered into a Proprietary Information Agreement with RBC on September 10, 2014 ("Raytheon NDA"), a copy of which is appended hereto as **Exhibit A**.  The Raytheon NDA contains binding confidentiality provisions that obligate both parties to retain the confidentiality of each party's respective trade secrets and confidential business information.

14.     The Raytheon NDA at Section 3 required Raytheon to take the following measures to maintain RBC's trade secrets and confidential business information received under the procedures set forth in the Agreement:

a.     hold it in confidence from the date of receipt under this Agreement;

b.     use it only for the purposes specified above in the recitals in connection with the use of the Discloser's Proprietary Information and/or such other purposes as may be subsequently authorized in writing by the Discloser;

4

    c.      make it available, subject to Section 11 below, only (i) to its employees who have a need to know in order to carry out their duties in connection with the purposes specified above and who have suitable obligations of confidentiality applicable to such Proprietary Information and (ii) to certain other parties as specified in Section 6, below; and

    d.      not otherwise use or disclose it except as expressly authorized in this Agreement or except as otherwise authorized in writing by the Discloser.

15.      The Raytheon NDA permitted the disclosure of the other party's Proprietary Information to certain third parties as provided in Section 6(b). This included vendors and subcontractors, under the following conditions:

Recipient may disclose Discloser's Proprietary Information to vendors and subcontractors to the extent required in connection with the purpose specified above provided that such vendors and subcontractors have undertaken written obligations to protect Discloser's Proprietary Information in a manner at least as protective as the provisions of this Agreement or in such other form approved in writing by the Discloser.

16.      As a result of the Raytheon NDA, and in furtherance of the proposed transaction, Raytheon provided RBC with drawings and specifications for a standard rod end bearing and associated bushings to be incorporated for the wing assembly of the SDB II project.

17.      Specifically, on or about March 30, 2015, Raytheon provided RBC with initial bearing design prints for the rod end bearing and bushings needed for the SDB II project.

18.      The drawings and specifications from Raytheon included a standard rod end bearing and the associated bushing which are generally available in the marketplace. After receiving the drawings and specifications, RBC's engineers determined that, based on the application of the requested rod end bearing – as part of a wing assembly for guided munitions dropped from aircraft – RBC could design a better, stronger and more reliable rod end bearing that would provide greater performance under extreme weather and geographic conditions.

19.     With Raytheon's blessing, RBC's engineering department immediately set to work, using Raytheon's original plans as a starting point, to create a new and unique rod end bearing product with associated bushings (referred to collectively herein as RBC's "proprietary rod end bearings"), documented by RBC in engineer notes, drawings and designs.  Incorporating decades of experience in this specialized field of engineering, RBC engineers worked independently from Raytheon to create new and unique proprietary rod end bearings through RBC's independently-funded research and development.

20.     RBC engineers improved upon the product referenced in Raytheon's original plans, thereby creating a highly specialized new rod end bearing with increased strength and rigidity, and more corrosion resistance, designed specifically for the application requirements needed for the SDB II project.  RBC's unique engineering design includes the use of stronger materials and new protective additives and coatings, which allow for a higher load capacity and more durability than the generic rod end bearing in Raytheon's original specifications.

21.     RBC's research and engineering work was documented by RBC in highly confidential, proprietary notes and drawings.  Prior to sharing these designs with Raytheon, a restrictive RBC-Heim legend was placed on the drawings and specifications, making clear that the drawings and designs included RBC confidential information and trade secrets relating to the proprietary rod end bearings.

22.     Pursuant to the Raytheon NDA between Raytheon and RBC, RBC retained all ownership rights to its intellectual property, and more specifically, to the designs, drawings and specifications for the proprietary rod end bearings in the final drawings and specifications sent by RBC to Raytheon.

6

23.     Communications between RBC and Raytheon during this process make clear that Raytheon supported RBC's efforts to improve upon the standard rod end bearing for use in the SDB II project, and acknowledged the time and effort expended by RBC to create the improved product.  Raytheon ultimately authorized and approved RBC's drawings and specifications. In order to test the newly-designed rod end bearing in the field, RBC submitted a small number of the product to Raytheon in 2015 as part of Raytheon's experimental process.

24.     Pursuant to the terms of the Raytheon NDA, Raytheon had the right to send copies of its drawings and specifications, with RBC's proprietary information and trade secrets, to vendors, all of whom were required to enter into nondisclosure agreements, for purposes of sourcing and assembling parts for the SDB II project, so long as Raytheon took steps to identify and protect RBC's trade secrets contained in those drawings and specifications.

25.     On information in belief, and in compliance with the terms of the Raytheon NDA, RBC's confidential and proprietary information and its trade secrets were then incorporated by Raytheon into its final design drawings and specifications for the SDB II project, which include the engineering notes and specs developed by RBC and which specifically reference RBC Heim as the suggested supplier for the proprietary rod end bearings.

26.     On information and belief, prior to 2016, Klune Industries ("Klune"), a non-party to this lawsuit, was a Raytheon supplier and assembler, and was under contract with Raytheon to source and assemble approved component parts, including the proprietary rod end bearings, for the wing assembly of the SDB II project.

27.     In 2016, Klune and RBC were parties to a confidentiality agreement whereby RBC was Klune's exclusive supplier of the proprietary rod end bearings used for Raytheon's SDB II project.  For several months, RBC manufactured the proprietary rod end bearings for

7

Klune without incident, which were thereafter included in assemblies by Klune and Raytheon for testing and experimentation by Raytheon in the SDB II project.  On information and belief, at all times, Klune respected and complied with its confidentiality obligations to RBC, maintained the secrecy of the drawings and specifications for the proprietary rod end bearings, and considered RBC as the exclusive provider of the proprietary rod end bearings.

28.     In July 2016, Raytheon apparently replaced Klune as its component parts supplier and assembler, and Raytheon entered into a nondisclosure agreement with Multicut Denmark.

29.     Upon information and belief, Multicut Denmark is a global manufacturer and supplier of semi-finished and component parts, including bearings and bushings, and sells and distributes these parts on a global scale, including in foreign and interstate commerce.  RBC and Multicut Denmark are engaged in the commercial sale of engineered products and are competitors with regard to certain products.

30.     Upon information and belief, Multicut Denmark has one or more contracts with Raytheon by which Multicut Denmark sources and assembles parts for munitions developed, manufactured and sold by Raytheon.

31.     Upon information and belief, Raytheon contracted with Multicut Denmark to replace Klune and to supply and assemble component parts for the wing assembly for the SDB II project.

32.     Upon information and belief, in furtherance of meeting the above SDB II project supplier needs, Raytheon provided Multicut Denmark with plans, drawings, specifications and other documents including information from Raytheon relating to the components and assemblies required for the SDB II project.

8

33.     Upon information and belief, Raytheon provided Multicut Denmark with a set of drawings and specifications that included express reference to RBC as the supplier for the proprietary rod end bearing for its SDB II project.

34.     Nonetheless, on information and belief, Raytheon forwarded its plans and specifications for the wing assembly of the SDB II project, which incorporated RBC's trade secrets, to Multicut Denmark without taking adequate steps, as required under the Raytheon NDA, to protect RBC's confidential and proprietary information and trade secrets. Although Raytheon listed RBC as the preferred provider for the parts on the drawings, Raytheon's drawings do not identify the rod end bearing design and specifications as the trade secrets of RBC.

### RBC Dealings with Multicut Denmark and MNA

35.     On August 18, 2016, RBC was contacted via email by Frank Dühring, who identified himself as both the Business Development Director of Multicut Denmark and Chief Executive Officer MNA.  Dühring indicated in the email that MNA had contracted with Raytheon to be the new component purchaser and assembler for the SDB II project, presumably replacing Klune.

36.     Dühring further stated that MNA was sourcing parts for Raytheon's SDB II project, and he acknowledged that RBC was the supplier of the part numbers corresponding with the proprietary rod end bearing and associated bushing.

37.     Dühring submitted an initial request for quote ("RFQ") from RBC for its proprietary rod end bearings.  Dühring attached to the email a spreadsheet of required quantities and delivery deadlines for the product through 2026.  Dühring indicated that the product would be shipped to MNA's warehouse in Colorado.

38.     Dühring inferred in the email that MNA had the contract with Raytheon to be its

supplier and assembler for the wing assembly on the SDB II project.  In fact, on information and

belief, Raytheon had entered into a contract not with MNA, but with Multicut Denmark, a detail

that Dühring did not mention in the email.

39.     Because RBC had been providing its proprietary rod end bearings and associated

bushings to Raytheon, through Klune, RBC looked forward to dealing with Dühring and MNA.

RBC provided a quote for 12 part numbers, which quote included some of RBC's confidential

product and pricing information.  RBC quoted prices for the proprietary rod end bearings that

were the same (or even slightly below) the price quoted to Klune for the same product.

40.     Thereafter, Dühring indicated that MNA wanted to negotiate a long-term supply

agreement with RBC to continue providing the proprietary rod end bearings for the Raytheon

SDB II project.  Throughout most of 2017, Multicut Denmark and MNA engaged RBC in

negotiations for RBC to be the exclusive supplier of its proprietary rod end bearings (and

potentially other products) for the Raytheon SDB II project.

41.     Although Dühring participated in these negotiations, most of the negotiations

actually took place between RBC and in-house legal counsel for Multicut Denmark.  Numerous

drafts of preliminary deal documents, including a long-term supply agreement, were exchanged

via email between RBC and Multicut Denmark.  RBC also held several high level meetings with

Dühring and Multicut Denmark in an effort to consummate an agreement for the sale of the RBC

proprietary rod end bearings to MNA in the United States to be used in Raytheon's SDB II

project.

42.     According to Dühring, Raytheon anticipated needing RBC's proprietary rod end

bearings for the SDB II project through at least 2023, and possibly longer.  Based upon the

information provided to RBC by Dühring regarding component needs for the SDB II project,

which included the proprietary rod end bearings, the estimated market value of the RBC product

needed to satisfy Raytheon's SDB II project was at least approximately seven million dollars

(US $7,000,000.00).

43.     In January 2017, RBC received another RFQ for more of RBC's proprietary rod

end bearings. Although the request indicates the shipping address to be for MNA in Colorado,

the request itself appears on Multicut Denmark stationery and was forwarded by an employee of

Multicut Denmark. This request sought quotes for more detailed information regarding RBC's

confidential pricing and manufacturing lead times.

44.     Before RBC agreed to submit further quotes in response to these requests for

additional, confidential pricing information, RBC requested that Dühring enter into a mutual

confidentiality agreement, which was entered into between RBC and MNA on February 13, 2017

("RBC-MNA Confidentiality Agreement").  Although Multicut Denmark was not a party to the

RBC-MNA Confidentiality Agreement, its in-house lawyers in Denmark engaged in the

negotiations with RBC over the terms and conditions of the document.

45.     In a key provision in the RBC-MNA Confidentiality Agreement, MNA agreed

that it and its agents would ensure RBC's confidential information would be used solely for the

limited purpose of evaluating the proposed transaction between RBC and MNA for a long-term

supply agreement, whereby RBC would be the exclusive supplier for the proprietary rod end

bearings for the SDB II project.  MNA and its agents were otherwise prohibited from disclosing

RBC's confidential and proprietary information to any third party for its own use or benefit or

for the benefit of any third party.

46.     At no time after agreeing to exchange its confidential and proprietary information

and trade secrets did RBC extinguish its ownership rights to any of its intellectual property, and

more specifically, to its ownership of trade secrets contained in the RBC rod end bearings

designs.  Neither MNA nor Multicut Denmark ever sought or obtained RBC's consent, written or

otherwise, to disclose the confidential information.

47.     After execution of the RBC-MNA Confidentiality Agreement, Multicut Denmark

sent Purchase Orders to RBC for parts for the SDB II project.  Although the Purchase Orders all

showed MNA as the designated recipient at a shipping address in Colorado, the Purchase Orders

were on Multicut Denmark's stationery and came from Multicut Denmark.

### RBC Learns of Multicut Denmark's and
### MNA's Unlawful Distribution of RBC Trade Secrets

48.     RBC met with MNA and/or Multicut Denmark at the Paris Air Show in 2017 and

discussed a long-term supply agreement.  Dühring continued to express interest in consummating

an exclusive contract with RBC for its proprietary rod end bearings for the SDB II project.

However, it was also during these discussions that Dühring started to express his feeling that

RBC's prices for the proprietary rod end bearings were too high.

49.     Subsequently, in or around late June 2017, Dühring shared with RBC's sales team

that he intended to disclose RBC's confidential rod end bearing designs to the manufacturers of

rod end bearings in the market to seek lower price bids.  In response, RBC promptly warned

Dühring in writing that the design and specifications for the proprietary rod end bearings

contained in the Raytheon drawings were RBC's confidential information and trade secrets, and

that RBC would seek enforcement of all its legal protections and rights.

50.     RBC has since learned that, while Dühring and Multicut Denmark were negotiating the long-term supply agreement with RBC, in or around May or June 2017, Multicut Denmark – at the direction of Dühring – sent copies of the Raytheon drawings incorporating RBC's design and specifications and trade secrets, to RBC's competitors in the bearing manufacturing industry, including numerous manufacturers in Europe and the United States. Emails produced in the action against MNA indicate that Multicut Denmark's Elsebeth Klitholm was forwarding the drawings to these companies to seek lower bids on the rod end bearings for the SDB II project.  Multicut Denmark distributed RBC's proprietary information without the knowledge or consent of RBC.

51.     In fact, through another vendor, RBC's affiliate, RBC France SAS, RBC actually received a copy of a Multicut Denmark RFQ seeking quotes for the rod end bearing in the Raytheon drawings that included RBC's proprietary rod end bearing design and specifications. The Raytheon drawings appended to the Multicut Denmark RFQ, however, no longer referenced that RBC-Heim was the owner of the intellectual property regarding the rod end bearings, or that RBC-Heim had been identified in the drawings as the preferred supplier.

52.     Instead, the drawings in the RFQ had been altered with a label claiming the design and technical information was "Proprietary Multicut & Raytheon," and now included the Multicut logo where RBC-Heim previously had been identified as the supplier by Raytheon.

53.     The drawings appended to the Multicut Denmark RFQ clearly contain RBC's unique specifications related to the strength, hardness and corrosion resistance of the rod end bearing, all of which are RBC trade secrets and proprietary and confidential information, but all references to RBC or RBC Heim were conspicuously removed or covered up.

54.     RBC contacted Dühring via email to inform him that RBC had discovered MNA or Multicut Denmark had improperly distributed RBC's trade secrets contained in the Raytheon drawings and specifications for the SDB II project.

55.     Dühring then forwarded RBC's email to Raytheon with no explanation.  Instead, Dühring responded to RBC, confirming and conceding that Multicut Denmark had indeed sent the design and specifications to other suppliers, and that MNA and Multicut Denmark had sought an alternate supplier of RBC's proprietary rod end bearings for the SDB II project.  Dühring denied that the Raytheon drawings contained any trade secrets belonging to RBC.  Dühring then forwarded his response to Raytheon, which suggests that Raytheon knew, by July 2017, that RBC was claiming its rights to the trade secrets incorporated by Raytheon into its drawings and specifications related to the SDB II project, and was asserting that Multicut Denmark and/or MNA had distributed RBC's trade secrets improperly.

56.     On information and belief, Multicut Denmark intentionally used and disclosed RBC's proprietary and confidential information and trade secrets, without RBC's knowledge or consent, by passing off RBC's rod end bearing specifications as its own and sending copies of those drawings to other bearing manufacturers in Europe and the United States that are direct competitors of RBC.

57.     On information and belief, by distributing RBC's proprietary trade secrets in order to solicit bids from RBC's competitors, Multicut Denmark acted with willfulness and complete disregard of RBC's ownership rights to the intellectual property by removing all indicia that RBC's trade secrets were included in the designs, drawings and related technical data.  On information and belief, Multicut Denmark then improperly and illegally disclosed

14

RBC's proprietary and confidential information, including RBC trade secrets, to third parties in an effort to solicit a lower price and increase its profits.

58.     On information and belief, Multicut Denmark willfully misappropriated RBC's proprietary and confidential information and designs by its unauthorized use and distribution of RBC's trade secrets in order to find an alternate supplier for the RBC proprietary rod end bearings, and used RBC's trade secrets to solicit bids against RBC.  Multicut Denmark, by its conduct, also acted intentionally, willfully and with malice to cut RBC out of any future supply contracts with Raytheon.

**No Long-Term Supply Agreement Ever Materialized**

59.     After RBC confronted Dühring about Multicut Denmark's distribution of RBC's trade secrets, Dühring actually made efforts to again reassure RBC that MNA and Multicut Denmark planned on using RBC to source the proprietary rod end bearings.  Dühring and in-house attorneys for Multicut Denmark continued negotiating the long-term supply agreement and, in August 2017, placed an order with RBC for a substantial amount of the proprietary rod end bearings.  This purchase, substantially more significant than the earlier purchases, appeared to be a good faith effort by Dühring to repair the relationship and move forward with RBC as the exclusive supplier.

60.     MNA and Multicut Denmark never consummated the long-term supply agreement or any other contract under which RBC would supply its proprietary rod end bearings for the Raytheon SDB II project.  In fact, after RBC made the August 2017 shipment to MNA in Colorado, Dühring stopped communicating with RBC.

61.     In email correspondence between Dühring and Multicut Denmark employees prior to the August 2017 shipment, Dühring stated that he and Multicut Denmark essentially

15

needed to string RBC along long enough with discussions of a long-term supply agreement to keep Raytheon supplied with the proprietary rod end bearings until its new supplier, using designs and specifications containing RBC's trade secrets, could start producing the rod end bearings in RBC's place.

62.     As a direct result, RBC lost any opportunity to enter a long-term supply agreement connected to the Raytheon SDB II project, a loss in sales of approximately $7,000,000.00.

63.     On information and belief, Multicut Denmark – and not MNA – had and retains the contract with Raytheon to source parts for and assemble the wing assembly for the SDB II project.  As a result, Multicut Denmark has been generating revenues for itself, in part, at the expense of RBC, since Multicut Denmark found a supplier that was prepared to manufacture the rod end bearings, using RBC's proprietary information and trade secrets that were unlawfully distributed, at a lower cost.

**Raytheon's Complicity in the Unlawful Distribution of RBC Trade Secrets**

64.     In the related pending action by RBC against MNA, MNA has taken the position in its pleadings that Raytheon provided the drawings and specifications to Multicut Denmark without any indication that RBC's proprietary information and trade secrets were incorporated therein.

65.     In 2015, when Raytheon first provided RBC with drawings and specifications that included the standard rod end bearing for the wing assembly of the SDB II, Raytheon agreed to allow RBC the opportunity to make improvements to the design specifically intended to address the unique weather and geographic challenges in which the SDB II would likely be deployed.

66.     With the encouragement of Raytheon, RBC's team of engineers employed their decades of experience in the field to conduct tests and experiments in order to complete a design for a new, stronger and more durable rod end bearing for this specific munitions application.

67.     RBC shared its engineering team's results and its final design and specifications with Raytheon, subject to the Raytheon NDA, solely and specifically because Raytheon had led RBC to believe Raytheon would maintain the confidentiality of RBC's proprietary information.

68.     Raytheon acknowledged the hard work that RBC did to create the significantly improved design for the rod end bearing and, while Klune was Raytheon's contracted supplier and assembler for the wing assembly, RBC was the exclusive source for the proprietary rod end bearings used by Raytheon in testing and experimentation in the SDB II project.

69.     At no time did Raytheon contend that it believed RBC's design and specifications for the proprietary rod end bearings, in fact, belonged to Raytheon.

70.     Nevertheless, on information and belief, Raytheon forwarded its plans and specifications for the wing assembly of the SDB II project, which incorporated RBC's trade secrets, to Multicut Denmark without taking adequate steps, as required under the Raytheon NDA, to protect RBC's confidential and proprietary information and trade secrets. Although Raytheon listed RBC as the preferred provider for the parts on the drawings, Raytheon's drawings do not identify the rod end bearing design and specifications as the trade secrets of RBC.

71.     On information and belief, at the time Dühring first communicated with RBC that MNA had become the sourcing and assembly contractor for the wing assembly on the SDB II, MNA did not have a nondisclosure agreement directly with Raytheon, but MNA clearly had possession of Raytheon's drawings and RBC's proprietary design and specifications.

17

72.     When RBC became aware and confronted Dühring and Multicut Denmark for unlawfully distributing RBC's trade secrets to its competitors, as detailed above, Raytheon was informed by Dühring, but Raytheon did nothing to prevent continued distribution by Multicut Denmark of RBC's trade secrets.

73.     Raytheon directly benefited from Dühring's scheme to string RBC along with promises of a long-term supply agreement, by having access to RBC's products containing RBC's trade secrets, until its competitor – hired by Multicut Denmark – was able to produce and sell to Multicut Denmark, for use by Raytheon, the rod end bearings using RBC's design and specifications.

74.     After RBC commenced the related proceeding against MNA in 2018, Dühring informed Raytheon that Multicut Denmark and MNA could not continue supplying the rod end bearings designed by RBC until Raytheon confirmed the following statement, in writing:

> Raytheon is the rightful owner of the design of the part on the drawings below (the rod end bearings), and that the drawing is proprietary to Raytheon.  Raytheon also confirms that Multicut can ask any source for this parts as long as they meet the requirements on the drawing [and are approved government suppliers].

75.     Raytheon responded to Dühring in writing, stating falsely that Raytheon did, in fact, own all of the intellectual property contained in the drawings and specifications showing RBC's proprietary rod end bearings.

### RBC Trade Secrets

76.     RBC's confidential information, which constitutes RBC's trade secrets and/or proprietary confidential information, includes, but is not limited to, the following: RBC's business plans; forecasts; marketing  analyses; business relationships; product information; pricing information; profit margin information; cost information; purchasing information;

designs, drawings, inventory formulas; research and development information; pricing details for

products; product specifications; heat treatment; material certifications; bills of material;

financial projections; technical; engineering and scientific research; terms of commercial

contracts; business negotiations; and inclusive of the fact that the parties herein were in a

business relationship and/or engaged in the discussions related to mutually acceptable definitive

agreements.

77.     RBC has taken extensive steps to maintain the secrecy of its proprietary and

confidential information and its trade secrets.  Specifically, RBC shared its trade secrets with

Raytheon only after execution of a valid and enforceable Raytheon NDA.  In turn, the Raytheon

NDA (i) created an obligation for Raytheon and its vendors, including Multicut Denmark and

MNA, to keep confidential RBC's proprietary and confidential information and trade secrets, and

(ii) allowed only limited disclosure on a need-to-know basis and to that extent which required all

recipient vendors to also be bound to the Raytheon confidential agreement terms.

78.     RBC also entered into the above-referenced RBC-MNA Confidentiality

Agreement, which likewise directly obligates Multicut Denmark to maintain the confidentiality

of RBC's proprietary and confidential information and its trade secrets, and likewise strictly

limits disclosure of such information on only a need-to-know basis.

79.     RBC included its restrictive legend and logo on its design drawings and

specifications, and clearly indicated thereon that the content information was RBC's proprietary

and confidential information, including its trade secrets.  Specifically, the proprietary notice

states:

> This document contains confidential and trade secret information. It is the
> property of RBC-Heim Bearing Company.   It is given to the receiver in
> confidence. The receiver by reception and retention of the documents accepts the

19

document in confidence and agrees that, except as authorized in writing in advance by RBC-Heim Bearing Company, it will (1) not use the document or any copy thereof or the confidential trade secret information therein, (2) not copy the document, (3) not disclose to others either the document or the information there in, and upon completion of the need to retain the document or upon demand, return the document. All copies thereof and all matter copied thereof to RBC-Heim Bearing Co.

Subject to, and in reliance upon, the above-referenced agreements, RBC turned over those documents, with this restrictive legend and logo, in confidence directly to Raytheon.

80.     In addition to the express obligations set forth in the above-referenced agreements, Multicut Denmark requested and received RBC quotes and later purchased RBC's proprietary rod end bearings, subject to the agreed upon, express RBC terms and conditions of sale found at www.rbcbearings.com, which product was shipped to MNA in Colorado.

81.     Accordingly, by accepting the RBC quote, and later purchasing the RBC products, Multicut Denmark also agreed to be bound by the following terms and conditions of an RBC sale:

**INTELLECTUAL PROPERTY**

Company retains all ownership, license and other rights to all patents, trademarks, copyrights, trade secrets and other intellectual property rights related to the product and services, and except for the right to use the products and services that are subject of this Agreement, Purchaser obtains no rights to use any such intellectual property.   RBC's pricing quotes also contain proprietary and confidential information, and trade secrets in the form of pricing and specific product information.

82.     RBC also employs a variety of internal measures to protect the integrity of its confidential information and trade secrets. These measures include limiting disclosure to only approved employees and customers, and monitoring all employee and customer access to RBC information systems.  RBC requires an identification card to enter its physical facilities and further restricts access to sensitive research and development areas.

83.     All RBC confidential and proprietary information, including its trade secrets, drawings and designs, are password protected by an electronic vault computer system, and access is strictly limited to a need-to-know basis. Engineers and RBC staff are trained in maintaining the processes that protects the secrecy of RBC's confidential information, and RBC requires all employees to sign an Intellectual Property agreement. RBC also uses internal computer security to protect confidential data and product information, and this information is only provided to employees, vendors and customers on a "need to know basis".

84.     The aforementioned confidential information and trade secrets are of great value to RBC; RBC has invested substantial money, business resources and efforts in researching and developing the drawings, designs and confidential information that is the subject of this dispute. RBC has devoted substantial resources, including RBC's independently-funded research and development, on its proprietary products and trade secrets referenced herein.

85.     RBC's competitive position in the industry is based on its ability to develop its intellectual property and protect its trade secrets.  For example, although the original Raytheon drawings contained some standard catalog bearing information readily available to the public, it was RBC's engineering and novel refinement of this particular rod end bearing, by customizing the materials, strength and coatings, to the intended application for Raytheon, and amassing critical information through research, testing and expertise that led to the development of the superior and unique RBC product.

## COUNT ONE
## BREACH OF CONTRACT

86.     RBC incorporates the allegations in Paragraphs 1 through 85, above, as though fully set forth herein.

87.     As set forth above, Raytheon and RBC entered into a valid and enforceable

contract, namely, the Raytheon NDA, on September 10, 2014.

88.     Based on the contract terms, Raytheon had a duty to maintain the confidentiality

of RBC's intellectual property and trade secrets, including RBC's drawings, designs, pricing and

product information related to the RBC's proprietary rod end bearings to be used in the Raytheon

SDB II project.

89.     RBC has performed all of its obligations under the Raytheon NDA.

90.     Raytheon breached the Raytheon NDA when it forwarded the plans and

specifications for the wing assembly of the SDB II project, which incorporated RBC's trade

secrets and confidential and proprietary information, to Multicut Denmark without taking

adequate steps to identify or protect RBC's trade secrets and confidential and proprietary

information as required by the Raytheon NDA, and by allowing those trade secrets to be

provided to MNA, with whom Raytheon did not yet have a nondisclosure agreement.

91.     Raytheon further breached the Raytheon NDA by doing nothing to prevent the

continued unlawful distribution of RBC's trade secrets as part of Raytheon's SDB II project by

Multicut Denmark and MNA, which was a vendor/subcontractor to Raytheon, after Raytheon

learned that RBC had asserted its ownership rights over its trade secrets and confidential

information and demanded that Multicut Denmark cease from such distribution.

92.     Raytheon further breached the Raytheon NDA by asserting ownership over the

design and specifications of the rod end bearings that had been properly designated by RBC as a

trade secret and confidential and proprietary information under the Raytheon NDA.

93.     Raytheon further breached the Raytheon NDA by authorizing its vendor/subcontractor Multicut Denmark to source the RBC rod end bearing from any source as part of the SDB II project, as long as that source met the requirements on the drawing.

94.     As a direct and proximate cause of Raytheon's conduct in breaching the Raytheon NDA, RBC has suffered and will continue to suffer economic injury, including lost profits, sales and lost business opportunities.  RBC has also suffered the irreparable financial loss of the confidentiality of its sensitive and valuable trade secrets.

95.     Accordingly, RBC is entitled to an award of damages in an amount to be determined at trial.

## COUNT TWO
## VIOLATION OF THE DEFEND TRADE SECRETS ACT OF 2016, 18 U.S.C. § 1836

96.     RBC incorporates the allegations in Paragraphs 1 through 95, above, as though fully set forth herein.

97.     RBC's designs, drawings, pricing data and related information relating to RBC's proprietary rod end bearings constitute RBC's confidential and proprietary information and trade secrets, the secrecy of which RBC has taken substantial steps to maintain, as defined in and in accordance with 18 U.S.C. § 1839(3).

98.     As set forth above, Raytheon gained access to RBC's proprietary and confidential information and trade secrets regarding RBC's proprietary rod end bearings, pursuant to the confidentiality obligations set forth in the Raytheon NDA.

99.     Raytheon, an entity engaged in interstate and foreign commerce, misappropriated RBC's proprietary and confidential information and trade secrets in violation of the DTSA by disclosing that information to a third party without taking adequate steps to identify or protect

RBC's proprietary and confidential information and trade secrets, having acquired such information under circumstances giving rise to a duty to maintain its secrecy or to limit its use.

100.    Raytheon further misappropriated RBC's proprietary and confidential information and trade secrets in violation of the DTSA by asserting ownership over that information and authorizing its further disclosure by third parties without limitation, having acquired such information under circumstances giving rise to a duty to maintain its secrecy or to limit its use.

101.    Raytheon directly benefited from its misappropriation, which allowed it to have access to RBC's products containing RBC's trade secrets, until its competitor – hired by Multicut Denmark – was able to produce and sell to Multicut Denmark and MNA, for use by Raytheon, the rod end bearings using RBC's design and specifications.

102.    As a direct and proximate cause of Raytheon's misconduct, as set forth above, RBC has suffered, and will continue to suffer, monetary damages.

103.    Pursuant to 18 U.S.C. § 1836(b)(3)(B), RBC is entitled to recover from Raytheon its damages for actual loss caused by the misappropriation of RBC's trade secrets.

104.    Pursuant to 18 U.S.C. § 1836(b)(3)(B), RBC is also entitled to recover from Raytheon damages for any unjust enrichment caused by the misappropriation of the trade secrets that is not otherwise addressed in computing damages for RBC's actual loss.

105.    Alternatively, pursuant to 18 U.S.C. § 1836(b)(3)(B), in lieu of damages measured by any other methods, RBC is entitled to recover from Raytheon damages caused by misappropriation of RBC's trade secrets measured by imposition of liability on Raytheon for a reasonable royalty for its unauthorized disclosure or use of RBC's trade secrets.

106.    As set forth above, Raytheon's misconduct was willful and malicious and, pursuant to 18 U.S.C. § 1836(b)(3)(C), RBC is entitled to exemplary damages in an amount of not more than twice times the amount of the damages awarded herein.

107.    As a direct and proximate cause of Raytheon's conduct, RBC has suffered and will continue to suffer irreparable financial loss, loss of goodwill and loss of confidentiality of its proprietary and confidential information, including its trade secrets.

108.    As such, pursuant to 18 U.S.C. 1836(b)(3)(A), RBC is entitled to a permanent injunction enjoining Raytheon from engaging in any further actual or threatened misappropriation of RBC's trade secrets.

**COUNT THREE**
**MISAPPROPRIATION OF TRADE SECRETS**
**M.G.L. c. 93 §§ 42 *et seq.***

109.    RBC incorporates the allegations in Paragraphs 1 through 108, above, as though fully set forth herein.

110.    As set forth above, RBC owns and possesses certain confidential, proprietary and trade secret information.

111.    As set forth above, RBC devoted substantial time and effort and independently funded the expenses related to the development of its confidential information, trade secrets and intellectual property related to the RBC proprietary rod end bearing.

112.    RBC's confidential information and trade secrets provided an economic advantage from not being generally known to, and not readily ascertainable by proper means by, others who might obtain economic advantage from its acquisition, disclosure or use.

113.    As set forth above, RBC has taken reasonable efforts to keep this information secret and to protect against it being acquired, disclosed or used without RBC's consent,

25

including entering into confidentiality agreements, clearly marking documents, providing protection in terms and conditions of sale, and implementing internal measures to protect secrecy of trade secrets.

114.    As such, RBC's documents, consisting of technical designs, drawings, prints, product information and pricing information, and in particular, documents relating to RBC's proprietary rod end bearings, which were subject to RBC's efforts to maintain secrecy, are trade secrets as defined in M.G.L. c. 93, § 42.

115.    As set forth above, Raytheon entered into the Raytheon NDA, which authorized limited access to RBC's confidential information and trade secrets for purposes of negotiating a proposed transaction with RBC to supply rod end bearings for the SDB II project and obligated Raytheon to take adequate steps to assure that Raytheon's vendors and related third parties would likewise protect RBC's trade secrets.

116.    Raytheon's conduct as described above constitutes misappropriation of RBC's proprietary information and trade secrets, in violation of M.G.L. c. 93, § 42 et. seq.

117.    Upon information and belief, Raytheon's conduct in misappropriating RBC's trade secrets was intentional, knowing, willful, malicious, fraudulent and oppressive.

118.    As a direct and proximate cause of Raytheon's misappropriation of RBC's trade secrets, RBC has suffered and will continue to suffer substantial damages, and RBC is entitled to an award of compensatory damages, in an amount to be determined at trial, for loss of its trade secrets and confidential information.

119.    As a result of Raytheon's willful and malicious misappropriation of its trade secrets, RBC is entitled to exemplary damages, pursuant to M.G.L. c. 93, § 42B(b), by the

doubling of damages awarded to RBC under Section 42B(a).  Further, RBC is entitled to an award of its attorneys' fees and costs pursuant to M.G.L. c. 93, § 42C.

120.     Pursuant to M.G.L. c. 93, § 42B, RBC is also entitled to recover from Raytheon damages for any unjust enrichment caused by the misappropriation of the trade secrets that is not otherwise addressed in computing damages for RBC's actual loss.

121.     Alternatively, G.L. c. 93, § 42B, in lieu of damages measured by any other methods, RBC is entitled to recover from Raytheon damages caused by misappropriation of RBC's trade secrets measured by imposition of liability on Raytheon for a reasonable royalty for its unauthorized disclosure or use of RBC's trade secrets.

122.     As a direct and proximate cause of Raytheon's conduct, RBC has suffered and will continue to suffer irreparable loss of goodwill and loss of confidentiality of its proprietary and confidential information, including its trade secrets.

123.     As such, pursuant to M.G.L. c. 93, § 42A,  RBC is entitled to an injunction enjoining Raytheon from engaging in any further actual or threatened misappropriation of RBC's trade secrets.

## COUNT FOUR
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

124.     RBC incorporates the allegations in Paragraphs 1 through 123, above, as though fully set forth herein.

125.     Raytheon and RBC entered into a valid contract, namely the Raytheon NDA, which is governed by Massachusetts law.

126.     Under Massachusetts law, all contracts, including the Raytheon NDA include the implied covenant of good faith and fair dealing.

127.     RBC has, at all times, acted in good faith and upheld all its duties and obligations under the contract terms.

128.     Raytheon's actions as described above have had the effect of destroying or injuring RBC's right to receive the fruits of the Raytheon NDA.

129.     Such conduct, as set forth above, constitutes a breach by Raytheon of the covenant of good faith and fair dealing.

130.     As a direct and proximate cause of Raytheon's breach, RBC has suffered damages, specifically, and at a minimum, in the amount of the lost long-term supply contract opportunity with Raytheon, which is estimated to be at least seven million dollars (US $7,000,000.00).

**COUNT FIVE**
**DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201**

131.     RBC incorporates the allegations in Paragraphs 1 through 130, above, as though fully set forth herein.

132.     As set forth above, RBC invested substantial time and resources in developing the improved rod end bearings to be utilized in the SDB II project.

133.     As set forth above, RBC has gone to great lengths to protect the confidentiality and the secrecy of its designs and drawings relating to its trade secrets, including documents relating to the rod end bearings, including (i) entering into confidentiality agreements with third parties, including Raytheon, (ii) marking designs, drawings and related documents with legends and logos identifying such documents as confidential, proprietary trade secrets of RBC, and (iii) implementing strict internal controls to maintain confidentiality within RBC itself.

134.    Based upon the written statements made by Raytheon in which it asserted ownership over the design and specifications of the rod end bearings that had been properly designated by RBC as a trade secret and confidential and proprietary information under the Raytheon NDA, it is clear that, despite the substantial efforts of RBC to maintain the secrecy of its trade secrets, and RBC's warnings not to wrongfully utilize RBC's trade secrets and proprietary information, Raytheon refuses to recognize or honor the confidential nature of RBC's trade secrets and, more likely, deems such documents and information to not be confidential trade secrets belonging to RBC.

135.    As such, RBC seeks a declaratory judgment from this Court that the designs, drawings, pricing data and all other related documents set forth herein relating to the proprietary rod end bearings designed by RBC are the trade secrets of RBC protected under both the DTSA and M.G.L. c. 93, § 42 et. seq.

136.    This cause of action presents a justiciable controversy, sufficiently definite and concrete to warrant declaratory judgment.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Roller Bearing Company of America, Inc. prays for judgment as follows:

A.  in favor of Plaintiffs and against Raytheon on all causes of action set forth herein;

B.  awarding monetary damages to Plaintiff from Defendant, including pre-judgment and post-judgment interest;

C.  awarding incidental and consequential damages to Plaintiff from Defendant;

D.  ordering that Raytheon return of any amount it has unjustly earned;

E.  ordering that Defendant pay reasonable royalties to Plaintiff;

F.  awarding Plaintiff punitive and or exemplary damages against Raytheon as permitted under 18 U.S.C. § 1836(b)(3)(B);

G.  awarding Plaintiff exemplary damages, costs and attorneys' fees against Raytheon pursuant to M.G.L. c. 93, § 42C;

H.  awarding Plaintiff its attorneys' fees and expenses against Raytheon as provided under the RBC standard terms and conditions of sale;

I.  entering an injunction requiring Raytheon to destroy Plaintiff's trade secrets, which include, product pricing, and bearings designs, specifications and drawings;

J.  entering an injunction permanently enjoining Raytheon from engaging in any of the conduct set forth above; and

K.  Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff Roller Bearing Company of America, Inc. demands a trial by jury for all claims so triable.


THE PLAINTIFF,

ROLLER BEARING COMPANY OF AMERICA, INC.


By:      */s/ James F. Radke*
         James F. Radke, BBO# 667299
         MURTHA CULLINA LLP
         99 High Street, 20th Floor
         Boston, MA 02110
         Tel: (617) 457-4130
DATED: May 8, 2020     jradke@murthalaw.com

30