**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ROLLER BEARING COMPANY OF AMERICA, INC., <br><br> Plaintiff, <br><br> v. <br><br> RAYTHEON COMPANY, <br><br> Defendant. | Civil Action No. 1:20-cv-10889-IT |

## OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

PLAINTIFF ROLLER BEARING
COMPANY OF AMERICA, INC.

James F. Radke, BBO# 667299
MURTHA CULLINA LLP
99 High Street, 20th Floor
Boston, MA 02110
Tel: (617) 457-4130
jradke@murthalaw.com

Lorey Rives Leddy (PHV)
Richard J. Basile (PHV)
MURTHA CULLINA LLP
107 Elm Street, 11th Floor
Stamford, CT 06902
Tel: (203) 653-5400
lleddy@murthalaw.com
rbasile@murthalaw.com

OCTOBER 19, 2022                    *Attorneys for Plaintiff*

12486323v1

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ i

I.     INTRODUCTION ...................................................................................................... 1

II.    APPLICABLE LEGAL STANDARDS ..................................................................... 2

III.   ARGUMENT .............................................................................................................. 3

      A.     RBC Has a Protectible Trade Secret In Its Loader Slot Rod End Design ...... 3

      B.     Individual Design Features of the Bearing Design were Not Commonly Known ............................................................................................................... 4

      C.     RBC's Design is a Combination of Features Not Publicly Known, Readily Ascertainable or Obvious ................................................................. 10

      D.     Raytheon's Use of a Vendor Item Control Drawing Did Not Mean Raytheon Could Use the Drawing In Violation of the PIA ......................... 13

      E.     RBC Took Extensive Measures to Maintain the Secrecy of Its Design ....... 16

      F.     RBC Did Not Grant Intellectual Property Rights to Raytheon through Raytheon's General Terms and Conditions ................................................. 18

      G.     Counts II and III Are Not Barred by the Applicable Statutes of Limitations .................................................................................................... 22

IV.    CONCLUSION ......................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*178 Lowell Street Operating Co., LLC v. Nichols*, 152 F. Supp. 3d 47 (D. Mass. 2016) ........................................................................................................................................4

*Astellas Inst. for Regenerative Med. v. ImStem Biotechnology, Inc.*, 458 F. Supp. 3d 95 (D. Mass. 2020)....................................................................................................................23

*Atlantic Wool Combing Co. v. Norfolk Mills, Inc.*, 357 F.2d 866 (1st Cir. 1966) .........................12

*Bos. Redev. Auth. v. Bos. Priv. Bank & Tr. Co.*, 2018 WL 6933371 (Mass. Super. Nov. 6, 2018), *aff'd.* 152 N.E.3d 1154 (Mass App. Ct. Aug. 6, 2020)......................................2

*Caudill Seed and Warehouse Co., Inc. v. Jarrow Formulas, Inc.*, 2020 WL 3065626 (W.D. Ky. June 9, 2020)..............................................................................4

*Covidien LP v. Esch*, 378 F. Supp. 3d 119 (D. Mass. 2019) ..........................................................12

*Diomed, Inc. v. Vascular Sol., Inc.*, 417 F. Supp. 2d 137 (D. Mass. 2006).............................12, 17

*DUSA Pharm., Inc. v. Biofrontera Inc.*, 2020 WL 5995979 (D. Mass. Oct. 9, 2020) ........................................................................................................................................17

*Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 210 F.3d 1 (2000) ..........................................11

*Gillette Co. v. Provost*, 2017 WL 2292748 (Mass. Super. Apr. 19, 2017)..............................10, 12

*Harvard Apparatus Inc. v. Cowen*, 130 F. Supp. 2d 161 (D. Mass. 2001)....................................17

*Iconics, Inc. v. Massaro*, 266 F. Supp. 3d 449 (D. Mass. 2017)..........................................3, 10, 12

*Liddell Bros., Inc. v. Impact Recovery Sys., Inc.*, 2016 WL 1091065 (D. Mass. Mar. 21, 2016).............................................................................................................................21

*Loranger Const. Corp. v. E. F. Hauserman Co.*, 384 N.E.2d 176 (Mass. 1978) .........................21

*Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.2d 215 (1st Cir. 2005), *cert. denied*, 547 U.S. 1147 (2006) .......................................................................23

*McIntyre v. United States*, 367 F.3d 38 (1st Cir. 2004) .................................................................23

*Moss-Rosenberg Verft, A/S v. Gen. Dynamics Corp.*, 78 F.R.D. 55 (D. Mass. Nov. 30, 1977) ..........................................................................................................................................3

*Pawelko v. Hasbro, Inc.*, 2018 WL 6050618 (D.R.I. Nov. 19, 2018) ...........................................10

*Proctor Grp. Ins. Agency, Inc. v. Jones*, 2008 WL 2875452 (Mass. Super. June 6, 2008) ...................................................................................................................................3, 17

*Scottsdale Ins. Co. v. Torres*, 561 F.3d 74 (1st Cir. 2009) ...............................................................2

*Sibcoimtrex, Inc. v. Am. Foods Group, Inc.*, 241 F. Supp. 2d 104 (D. Mass. 2003) ....................22

*Softub, Inc. v. Mundial, Inc.*, 53 F. Supp. 3d 235 (D. Mass. 2014) ................................................22

*Students for Fair Admissions, Inc. v. Pres. & Fell. of Harvard Coll.*,346 F. Supp. 3d 174 (D. Mass. 2018)............................................................................................................3

*Sutra, Inc. v. Iceland Exp.*, 2008 WL 2705580 (D. Mass July 10, 2008)......................................10

*Tolan v. Cotton*, 572 U.S. 650 (2014)..............................................................................................2

*USM Corp. v. Marson Fastener Corp.*, 393 N.E.2d 895 (Mass. 1979)..........................................18

**Statutes & Rules**

35 U.S.C. § 102...............................................................................................................................12

35 U.S.C. § 103...............................................................................................................................12

Fed. R. Civ. P. 56(a) .........................................................................................................................2

Mass. Gen. Laws ch. 106, § 2-207.........................................................................................19, 22

Mass. Gen. Laws ch. 260, § 2A ...............................................................................................22, 23

## I.    INTRODUCTION

In 2014, Raytheon had a serious problem

intended to be dropped from an aircraft. Doc. No. 25, ¶ 12. Once launched, wings are supposed to deploy from the missile to provide more stability and accuracy in reaching a target; wing deployment is critical to the functionality of the SDB II. Doc. No. 126-1, at 35:17-36:5; 38:10-39:19. In 2014, Raytheon discovered

Unable to find a catalog or standard rod end that would work in its application, Raytheon invited RBC, subject to a Proprietary Information Agreement ("PIA"), to custom design a rod end to solve Raytheon's problem. *See* Doc. No. 130, ¶ 17-18; Doc. No. 111-2. RBC used its decades of engineering, metallurgy and tribology experience to quickly design, test and manufacture samples of a stronger, more durable and reliable rod end specifically for the wing assembly of the SDB II. Doc. No. 130, ¶ 18; Decl. of S. McNeil, Doc. No. 127, ¶ 5; Doc. No. 126-1, at 146:8-147:13. RBC's solution worked and the rod end, made to RBC's design, remained in the SDB II wing assembly for years. F. Duhring Tr., Ex. 23, Doc. No. 126-23, at 338:7-17. The RBC proprietary rod end design embodied RBC's trade secret which, pursuant to the PIA, RBC properly protected in its dealings with Raytheon to prevent public disclosure. Doc. No. 130, ¶¶ 19-21; Decl. of K. Giuntoli, Doc. No. 128, ¶ 7; Doc. No. 127, ¶ 43. Raytheon failed its obligation under the

1

PIA to maintain the secrecy of RBC's design and actively participated in the misappropriation of RBC's trade secrets, violating the PIA and applicable trade secrets laws.

Raytheon now moves for summary judgment on all claims in the Amended Complaint. Raytheon contends in its Memorandum of Law ("MOL") that, because RBC cannot demonstrate it had a protectible trade secret in its proprietary rod end design, RBC cannot prove its federal or state misappropriation claims and, accordingly, RBC also cannot prove Raytheon breached the PIA or the covenant of good faith and fair dealing[1], and RBC is not entitled to declaratory relief. *See* MOL, at 1. However, as set forth herein, disputed material issues of fact exist as to each of the grounds on which Raytheon has moved, requiring denial of the Motion in its entirety.

## II.    **APPLICABLE LEGAL STANDARDS**

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party ... [and] [a] fact is 'material' if it has the potential of determining the outcome of the litigation." *Scottsdale Ins. Co. v. Torres*, 561 F.3d 74, 77 (1st Cir. 2009). "[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial ... In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

---

[1] Raytheon claims entitlement to summary judgment on Count IV, on the grounds that "Massachusetts law does not recognize an independent claim for breach of the implied covenant of good faith and fair dealing separate and apart from a claim for breach of the underlying contract." MOL, at 7 n.4 (quoting *Bos. Redev. Auth. v. Bos. Priv. Bank & Tr. Co.*, 2018 WL 6933371, at *4 (Mass. Super. Nov. 6, 2018), *aff'd.* 152 N.E.3d 1154 (Mass App. Ct. Aug. 6, 2020)). In *Bos. Redev.*, the plaintiff agreed to dismissal of its breach of contract claim, and the court held, "[w]ithout a claim for breach of contract, [plaintiff's] claim for breach of the implied covenant of good faith and fair dealing also must be dismissed." *Id.* Here, RBC's breach of contract claim remains in the case. If, however, the Court determines no such independent claim is recognized under Massachusetts law, RBC requests that the allegations in Count IV be incorporated into the breach of contract claim in Count I.

The movant bears the initial burden of showing there is no genuine issue of fact. *See Anderson*, 477 U.S. at 256. If the movant carries its burden, then the burden shifts to the party opposing the motion for summary judgment to "set forth specific facts showing that there is a genuine issue for trial." *Id.* "[D]ecisions of the Court of Appeals for the First Circuit have made it abundantly clear that the granting of a motion for summary judgment is to be withheld where there is the slightest doubt as to the facts." *Moss-Rosenberg Verft, A/S v. Gen. Dynamics Corp.*, 78 F.R.D. 55, 58 (D. Mass. Nov. 30, 1977). Finally, where expert witnesses disagree on a material issue of fact, the matter should be resolved at trial and not on summary judgment. *See Students for Fair Admissions, Inc. v. Pres. & Fell. of Harvard Coll.*, 346 F. Supp. 3d 174, 193 (D. Mass. 2018).

### III.    ARGUMENT

#### A.  RBC Has a Protectible Trade Secret In Its Loader Slot Rod End Design.

Under Massachusetts law, for a plaintiff to prevail on a claim of misappropriation of trade secrets, it must demonstrate: (1) the information in question is a trade secret, (2) reasonable steps were taken to preserve the secrecy of the information, and (3) the defendant used improper means, in breach of a confidential relationship, to misuse such information. *See Proctor Grp. Ins. Agency, Inc. v. Jones*, 2008 WL 2875452 at *3 (Mass. Super. June 6, 2008). A trade secret is defined as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Iconics, Inc. v. Massaro*, 266 F. Supp. 3d 449, 452 (D. Mass. 2017).

Raytheon asserts it could not have misappropriated RBC's trade secret because the information claimed by RBC is not a trade secret and, therefore, not covered by the PIA. MOL, at 7-12. RBC's trade secret is for the design of a rod end loader slot bearing with a novel combination of materials and features for use in aircraft applications with harsh environments, such as the wing assembly of Raytheon's SBD II. Doc. No. 130, ¶¶ 18-38; Doc. No. 111-11; Doc. No. 111-20, at

12 Col 1: 17-27; Doc. No. 111-21, at 4-5; Doc. No. 111-24, ¶¶ 95, 96; Doc. No. 111-22; Doc. No. 127, ¶ 4; Ex. 4, Doc. No. 126-4, 135:18-137:11.[2]

The design for the subject rod end was the result of the bearing design expertise of RBC engineers, operating under RBC's Scott McNeil, who used his more than 28 years of aerospace bearing design experience, in conjunction with other RBC engineers and technical resources, to design, develop and test a new and nonobvious rod end design to solve Raytheon's problem. Doc. No. 130, ¶ 18; Doc. No. 127, ¶¶ 5, 6. The design was shared with Raytheon as an alternative proposal for a rod end design depicted in Raytheon's original drawing. Doc. 130, ¶¶ 19-21; *Compare* Doc. No. 111-3, *with* Doc. No. 111-8; Doc. No. 127, ¶ 7; Doc. No. 126-4, 124:10-125:14; Ex. 5, Doc. No. 126-5, 143:17-145:12. McNeil specifically marked his drawing to demonstrate the design was being produced pursuant to the PIA and that his proposal was to be kept confidential and proprietary pursuant to the PIA. Doc. No. 111-8; Doc. No. 111-1, ¶ 2; M. Gordon Tr., Ex. 6, Doc. No. 126-6, 140:1-23; Doc. No. 127, ¶ 7; Doc. No. 126-4, 124:10-125:14; 171:19-172:4; Doc. No. 126-5, 145:13-146:12.

**B. Individual Design Features of the Bearing Design were Not Commonly Known.**

Raytheon first argues RBC has no trade secret because the individual features making up the trade secret design either were individually publicly known or were requested by Raytheon. MOL, at 8, 13. However, the individual features were not commonly known or publicly available

---

[2] Raytheon's argument that RBC has "failed to properly identify its alleged trade secret" is both factually baseless and unsupported by the case it cites. MOL, at 8-9. In *178 Lowell Street Operating Co., LLC v. Nichols*, 152 F. Supp. 3d 47 (D. Mass. 2016), the court concluded plaintiff's misappropriation claim was lacking because it did not specifically point to documents purportedly containing trade secrets. In contrast, RBC has pointed specifically to documents containing the trade secret rod end design and its expert report with extensive explanations of RBC's proprietary combination of features. Doc. Nos. 111-8; 111-11; 111-21 at 4-5; 111-22; 111-24, ¶ 27-35. This is far from an instance in which a plaintiff alleges the "trade secrets you took are the ones we say you took without further identification." *Caudill Seed and Warehouse Co., Inc. v. Jarrow Formulas, Inc.*, 2020 WL 3065626 at *4 (W.D. Ky. June 9, 2020). Raytheon has a clear understanding of the trade secret information at issue.

as features of the exclusive and unique rod end design combination developed by RBC. Doc. No. 130, ¶¶ 18-38.

All successful bearing designs are the result of weighing and balancing various design features to work in combination with each other for particular applications. Doc. No. 127, ¶ 8; Decl. of R. Adams, Doc. No. 129, ¶ 4. In this case, even before RBC undertook the design of the subject rod end, Raytheon's engineer,

130, ¶ 17. RBC specifically selected the individual design features by considering how those individual design features would work in an improved combination, for a specific application – the SDB II program. Doc. No. 111-24, ¶¶ 95, 95; Doc. No. 127, ¶¶ 5, 6. The choices RBC made in selecting individual design features for the subject rod end were intentional and based on decades of engineering and rod end designing experience, resulting in RBC's trade secret design as a solution to Raytheon's

First, regarding RBC's choice of a ball made of 440C material, Raytheon's original

22; Doc. No. 127, ¶ 11. RBC chose the 440C ball material specifically for this design because

publicly known. Doc. No. 127, ¶ 10; Doc. No. 129, ¶ 7. McNeil chose a 440C ball material over

---

[3] Raytheon's assertion that RBC "does not deny each of the four (or six) features was publicly known thereby falling under one of the PIA exceptions to proprietary information," MOL, at 13, grossly mischaracterizes RBC's responses to Requests to Admit. In isolation, RBC had to admit that, for instance, the condition of H1150 steel for a rod end bearing housing was publicly known in 2014. 111-23, Req. No. 1). In response to the very next Request, however, RBC denies that the condition of H1150 steel for a rod end bearing housing *is not* RBC's trade secret, responding that "[b]ecause the condition H1150 steel for a rod end bearing housing *is part of the Alleged Trade Secret* this Request is denied." *Id.* at Req. No. 2 (emphasis added). Raytheon avoids the clear fact repeatedly asserted by RBC, including in RBC's responses to the Requests to Admit: the use of specific, individual features in rod ends may have been known prior to 2014, but the combination of these individual features for this particular type of bearing design for this specific application was not previously known (*see* Section III., C., *infra*).

5

a more brittle, less ductile Cobalt 6 (Stellite®6C), AMS5387, to improve the overall design. Doc. No. 127, ¶ 11. RBC's design using the 440C ball was *the opposite* in concept

RBC chose a harder ball, softer body, and no case hardening (nitride-Malcomize), resulting in superior design with greater damage resistance for the application – the SDB II program. Doc. No. 127, ¶¶ 11, 12. RBC also did not choose the 440C ball merely because RBC had material in stock; though the ball needed to be reprocessed, it was designed to be readily producible in RBC's manufacturing facility. Doc. No. 127, ¶¶ 10, 12. In sum, while a 440C ball may have used in other rod end designs, it was not publicly known to use a 440C ball in a loader slot rod end bearing design in combination with all the other features of the RBC proprietary rod end design. Doc. No. 127, ¶ 9; Doc. No. 129, ¶ 6.

Second, regarding the housing for the rod end, while a 17-4PH CRES with H1150 heat treatment may have been identified in other rod end designs, it also was not publicly known to use only this housing material in a loader slot rod end bearing design in combination with all the other features of the RBC proprietary design. Doc. No. 130, ¶ 23; Doc. No. 127, ¶ 13; Doc. No. 129, ¶ 8. RBC intentionally chose 17-4PH CRES with H1150 heat treatment for the housing as a tougher, more ductile material, ensuring the ball would yield the rod end at ultimate load in the intended application. Doc. No. 127, ¶ 14.

Third, while a solid film lubricant between a ball and housing may have been identified in other rod end designs, it was not publicly known to use a solid film lubricant in a loader slot rod end bearing design with all the other features of the RBC trade secret rod end design. Doc. No. 130, ¶¶ 24-25; Doc. No. 127, ¶ 15; Doc. No. 129, ¶ 9. As an initial point, Raytheon asserts the



protect the rod end from things like fretting corrosion caused by the rod end application. Doc. No. 127, ¶ 18.

Fourth, while a maximum radial play of the ball in the housing of 0.003 inches may have been identified in other rod end designs, it was not publicly known to use this specific maximum clearance in a loader slot rod end bearing design in combination with all the other features of the RBC trade secret rod end design. Doc. 130, ¶ 26; Doc. No. 127, ¶ 20; Doc. No. 129, ¶ 11. The chosen radial play was not publicly known, but was a design choice McNeil proposed, not only for manufacturing reasons, but to work in the intended application. Doc. No. 127, ¶ 21. This clearance was chosen to ensure a clearance that statistically would accommodate the surface buildup of oxide (corrosion) likely to occur in the application and to compensate for any rust buildup on the bearing surfaces that would otherwise reduce the internal clearance, further solving Raytheon's corrosion problem. Doc. No. 127, ¶ 22.

Separately, Raytheon contends



13. In any event, there is no evidence that that 0.003 in max radial play was known to be used in a loader slot bearing of RBC's design.

Further, RBC's expert, Adams, never agreed that RBC's required maximum radial play of 0.003 inches is a relaxation of the bearing industry standard which would result in less precise – or inferior – products. Doc. No. 129, ¶ 14. To the contrary, Adams believes the maximum radial play of 0.003 inches in this case *improved* the design, and his testimony regarding industry standards was only an explanation of the effect radial play has on stresses and failure modes of the bearing. Doc. No. 129, ¶¶ 12, 14; Doc. No. 111-26, 109:4-110:24.

Fifth, neither the minimum load rating requirement nor the load rating identified in RBC's confidential design were publicly known. Doc. No. 130, ¶¶ 29-33; Doc. No. 127, ¶ 24; Doc. No. 129, ¶ 15; Doc. No. 126-9, I 47:15-48:22; Doc. No. 126-6, 87:9-15. The minimum load rating requirement for a rod end is based on the application in which the rod end will be used. Doc. No. 126-9, II 80:10-81:23; Doc. No. 126-10, 22; Doc. No. 127, ¶ 27; Doc. No. 129, ¶ 16. Customers often supply performance requirements based on how the bearing acts and the different loads to which it will be subjected. Doc. No. 127, ¶ 25; Doc. No. 126-4, 67:7-13. In this case, Raytheon



Moreover, determining the load rating for the actual rod end – as opposed to the minimum load rating requirements for a bearing application – is a completely different analysis. Doc. No. 130, ¶¶ 34-36; Doc. No. 126-9, II 83:3-84:7; Doc. No. 127, ¶ 29; Doc. No. 129, ¶ 18. The load rating for the bearing itself is based on the design and testing of the bearing independent of the application in which it will be used. Doc. No. 127, ¶ 30; Doc. No. 129, ¶ 17. In this case, the load

rating for the RBC bearing design also was not publicly known. Doc. No. 127, ¶ 32; Doc. No. 129, ¶¶19, 22. There is no evidence that load rating for the RBC bearing design had ever been calculated before or was publicly available from any source. Doc. No. 130, ¶ 37. Doc. No. 126-6, 257:3-259:19; Doc. No. 127, ¶ 32; Doc. No. 129, ¶¶ 19, 22. No load rating calculation for the RBC bearing could have been attempted unless someone had first received the underlying proprietary information from RBC's proprietary design. Doc. No. 130, ¶ 38; Doc. No. 127, ¶ 31; Doc. No. 129, ¶ 20. RBC spent substantial time, resources, money and effort to determine the load rating for its trade secret rod end design precisely to confirm it would work in the Raytheon application. Doc. No. 130, ¶¶ 39-41; Doc. No. 127, ¶ 33; Doc. No. 126-4, 213:9-24. RBC used proprietary software, developed over decades, with a proprietary algorithm to assist in confirming the load rating calculations for RBC's proprietary design, a tool not available to the public or publicly known, further demonstrating that this design feature was not publicly known. Doc. No. 127, ¶ 34; Exs. 28 and 29, Doc. Nos. 126-28 and 126-29. Through testing and analysis, RBC confirmed that its design could meet the minimum load rating requirement determined by Raytheon. Doc. No. 127, ¶ 35. None of RBC's testing or results were publicly known. *Id.* at ¶ 33; Doc. No. 129, ¶ 21.

Lastly, while passivation of a rod end component may have been identified in other rod end designs, it was not publicly known to use passivation in a loader slot rod end bearing design in combination with all the other features of the RBC trade secret rod end design. Doc. No. 130, ¶ 42; Doc. No. 127, ¶ 36; Doc. No. 129, ¶ 23. RBC made the choice for Raytheon's specific application needs, in the wing assembly of the SDB II. The choice was intended to compliment and work together with the other design features to create a stronger, more durable and reliable component in the wing assembly, again,

In sum, Raytheon contends RBC's design did not constitute a protectible trade secret because each of the individual design features was either publicly known, recommended by Raytheon or not required by Raytheon. As set forth above, the individual design features were not

9

publicly known in this specific application – a highly confidential guided missile program dealing

████████████████████████████████████████ The features reflected conscious

choices by highly skilled engineers with expertise in designing bearings for the aerospace industry, specifically for Raytheon's application. Those choices also were intentionally selected to work together, in a unified whole, to provide Raytheon with the solution it needed for the SDB II wings to properly deploy. *Id.* At the very least, if a dispute of material facts exists as to whether individual features have been publicly available, summary judgment should be denied.

## C. RBC's Design is a Combination of Features Not Publicly Known, Readily Ascertainable or Obvious.

Massachusetts law is abundantly clear: a *unique or nonobvious combination* of known features is protectable by trade secrets. *Gillette Co. v. Provost*, 2017 WL 2292748, at \*3 (Mass. Super. Apr. 19, 2017); *Iconics*, 266 F. Supp. 3d at 454 (trade secret can contain elements which, by themselves, are in the public domain, but the unified and unique combination is a protectable secret); *Sutra, Inc. v. Iceland Exp.*, 2008 WL 2705580, at \*4 (D. Mass July 10, 2008). Even if Raytheon could demonstrate – which it has not – that the individual elements of RBC's rod end design were in the public domain, it is undisputed that RBC's loader slot rod end design formed by the combination of the design elements, resulting in RBC's trade secret, was unique and novel and did not exist prior to RBC's creation. Doc. No. 130, ¶ 43; Doc. No. 127, ¶ 39; Doc. No. 129, ¶ 26; Doc. No. 111-24, at ¶ 99. In fact, despite repeated opportunities to do so, neither Raytheon engineers nor Raytheon's expert were able to identify the prior existence of a single loader slot rod end design having the same combination of features in RBC's trade secret design. Doc. No. 130, ¶ 44; Doc. No. 126-5, 206:18-207:21; Doc. No. 126-9, II 75:5-76:13; Doc. No. 126-6, 124:2-125:20. *See also Pawelko v. Hasbro, Inc.*, 2018 WL 6050618, at \*4 (D.R.I. Nov. 19, 2018) (defendant failed to identify a single embodiment of known elements).

Raytheon's expert has even conceded, contrary to Raytheon's contention, that the RBC rod end design as a whole was not publicly known or common; his expert opinion is limited to the



Contrary to Raytheon's contentions, not only was the combination not publicly known; it was also not readily ascertainable or obvious. Doc. No. 130, ¶ 47; Doc. No. 127, ¶¶ 37, 38; Doc. No. 129, ¶¶ 27, 28, 29, 32-38; Doc. No. 111-24, ¶¶ 98-110. Gordon's assertion that the RBC design was readily ascertainable is disputed and false because he did not reach his conclusion using the proper means of publicly available information for his analysis. Doc. No. 126-6, 96:22-97:11, 145:19-25, 146:3-13. The starting point for determining whether something is readily ascertainable focuses on what is already publicly known. *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 210 F.3d 1, 11 (2000). Here, Gordon did not use only publicly available information; he

11

Finally, that the novelty and non-obviousness of RBC's combination of features exceeds the requirements to be a trade secret is evidenced by the granting, by the U.S. Patent and Trademark Office, of U.S. Patent Nos. 10,788,073 and 11,441,604, the claims of which embody RBC's trade secret design. Doc. No. 130, ¶¶ 48-49; Doc. No. 111-20; Ex. 30, Doc. No. 126-30; Doc. No. 127, ¶ 40; Doc. No. 129, ¶ 38; Doc. No. 111-24, ¶ 98. Under statutory requirements, in order to be patentable, an invention must be novel and nonobvious. 35 U.S.C. §§ 102, 103. The RBC patents include claims directed to RBC's novel and non-obvious combination of design features in the rod end bearing. Doc. No. 127, ¶ 40; Doc. No. 129, ¶ 38; Doc. No. 111-24, ¶ 98. The law is clear that the standards for novelty and non-obviousness for patentability are actually higher than the standard of novelty and non-obviousness for trades secrets. *See Atlantic Wool Combing Co. v. Norfolk Mills, Inc.*, 357 F.2d 866, 869 (1st Cir. 1966); *see also Diomed, Inc. v. Vascular Sol., Inc.*, 417 F. Supp. 2d 137, 144 n.5 (D. Mass. 2006); *Iconics*, 266 F. Supp. 3d at 458. The granting of the RBC patents is direct evidence that RBC's proprietary design was not publicly known, readily ascertainable or obvious.

Importantly, the issue of whether a combination of features is obvious is a question of material fact that should not be decided on summary judgment. *Gillette Co.*, 2017 WL 2292748, at *3 (whether the combination of features was "obvious" is a material fact in dispute defeating defendant's summary judgment motion); *Covidien LP v. Esch*, 378 F. Supp. 3d 119, 126 (D. Mass. 2019) (same). Raytheon has failed to demonstrate that no material issues of fact are in dispute as to whether the combination of the features in RBC's trade secret design was publicly known, readily ascertainable or obvious, thus preventing summary judgment. *Id.* at 126.

12

### D. Raytheon's Use of a Vendor Item Control Drawing Did Not Mean Raytheon Could Use the Drawing In Violation of the PIA.

Raytheon claims as an undisputed fact that, because it chose to mark drawings of the subject rod end as "Vendor Item Control" drawings, "RBC had (1) constructive notice that Final Vendor Item Control Drawing as a *vendor item control drawing* will be used for procurement for multiple vendors," and "(2) actual notice that the Final Vendor item Control Drawing states it is intended for procurement from multiple vendors." MOL, at 12 (emphasis in original).[5] Raytheon overstates what the marking of "Vendor Item Control" drawing means and, more importantly for purposes of its Motion, Raytheon ignores the existence of its obligations under the PIA. Raytheon also misstates RBC's "understanding" that those markings reflected an explicit statement by Raytheon that Raytheon intended to ignore (or unilaterally modify) its obligations under the PIA by freely sharing RBC's trade secrets with other bearing vendors.

As an initial matter, nothing in the applicable ASME Standard Y14.24-2012 (the "Standard") (Raytheon mistakenly cites to the superseded 1999 version), relating to Vendor Item Control Drawings, precluded Raytheon from putting RBC confidential or proprietary information in the drawing. Ex. 11, Doc. No. 126-11, at 11; Doc. No. 130, ¶¶ 50-51; Doc. No. 127, ¶ 46. In fact, the Standard specifically allows for the inclusion of "vendor-developed items" in a Vendor Item Control Drawing: "[a] vendor item control drawing provides an engineering description and acceptance criteria for commercial items or vendor-developed items that are procurable from a *specialized segment of industry.*" Doc. No. 126-11, at 11 (emphasis added). The Standard includes a definition of "vendor-developed items" as "[a] specialized version of a vendor's general product line which is not normally stocked as an off-the-shelf item but is procurable on order." *Id.,* at 3. This definition clearly includes RBC's proprietary design of the loader slot rod end bearing created

---

[5] Raytheon's claim that the "Raytheon Proprietary" marking also should have caused RBC to know Raytheon's intent is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮

for Raytheon's specific application. The Standard does not, as Raytheon contends, constitute an announcement dictating that a drawing incorporating a vendor's trade secrets may be freely sent out to the vendor's competitors simply because it is marked "Vendor Item Control Drawing."

Moreover, RBC had neither constructive nor actual notice that Raytheon would use the drawing with RBC's trade secret for procurement from multiple vendors, in violation of Raytheon's obligations under the PIA, simply because it was marked "Vendor Item Control." The only cited evidence of "constructive notice" is McNeil's testimony acknowledging that *one purpose* of the Vendor Item Control marking is to assure the identification, re-procurement and the interchangeability of parts; McNeil did not say, as Raytheon contends, he understood from the marking that RBC's design was no longer proprietary and Raytheon would freely use the drawing to procure the rod end from RBC's competitors. Doc. No. 130, ¶¶ 52-56; Doc. No. 126-4, 108:9-14; Doc. No. 127, ¶¶ 43, 45. Neither McNeil nor RBC believed the "Vendor Item Control" marking would eviscerate Raytheon's obligations under the PIA to keep RBC's trade secret confidential, or that Raytheon would subsequently claim such marking allowed it to unilaterally eliminate its obligations under the PIA.[6] Doc. No. 127, ¶ 47; Doc. No. 128, ¶¶ 8-9; Doc. No. 111-1, ¶ 6(a). In fact, the last drawing of the subject rod end bearing exchanged between Raytheon and RBC was not the Final Vendor Item Control drawing,  

2015, containing RBC's proprietary legend. Ex. 7, Doc. No. 126-7; Ex. 18, Doc. No. 126-18. RBC clearly intended to maintain its proprietary rights to the trade secret design.

For the same reasons, RBC did not have actual notice that Raytheon intended to use the drawing, which contained RBC's trade secret, in a completely unrestricted manner with other

---

[6] Three other RBC witnesses were asked by Raytheon during their depositions about the purpose and intent of the "Vendor Item Control" marking on engineering drawings. None of them understood the marking as a notification from Raytheon that Raytheon intended to freely send the drawing, with RBC's trade secret design, to other potential suppliers and RBC competitors. K. Giuntoli Tr., Ex. 12, Doc. No. 126-12, 133:25-134:9; 47:1-48:14; B. Anderson Tr., Ex. 13, Doc. No. 126-13, 36:25-39:18; J. Andrup Tr., Ex. 14, Doc. No. 126-14, 43:22-44:14.

competitor bearing suppliers merely because it is marked "Vendor Item Control." Doc. No. 130, ¶¶ 52-56; Doc. No. 126-4, 108:9-14; Doc. No. 127, ¶¶ 43, 45. Again, Raytheon relies on mischaracterized testimony from Scott McNeil as evidence, but McNeil did not testify that, because the Vendor Item Control drawing contained a "suggested source of supply," he knew Raytheon intended to seek out other sources of supply: McNeil stated the "suggested source of supply" merely indicates that a source and part number have been approved by Raytheon. Doc. No. 126-4, 108:22-109:16; Doc. No. 130, ¶ 57. In fact, the Final Vendor Item Control drawing in



Raytheon also alleges RBC had actual knowledge the Vendor Item Control Drawing would

be sent to other vendors because,



Raytheon's expert, Michael Gordon, actually corroborated McNeil's interpretation and understanding of the standard language on a Vendor Item Control drawing regarding approved

15

suppliers and suggested sources of supply: Gordon agreed the language simply means there is no



272:12-275:11. Critically, Gordon testified the facts in this case fall outside the definitions in the

ASME Standard for "Vendor Item Control" drawings because, according to Gordon, the Standard



In short, nothing submitted by Raytheon reflects either RBC's constructive or actual notice,

or RBC's actual knowledge, that Raytheon intended to freely share the drawing, containing RBC's

proprietary design, with RBC's competitors or other vendors simply because Raytheon marked the

drawing as "Vendor Item Control." To the contrary, Raytheon also marked the drawings with a

Raytheon copyright and as "Raytheon Proprietary," which RBC understood as demonstrating

Raytheon was actually complying with the PIA by treating the disclosed design in the same way

Raytheon treated its own proprietary and confidential information. Doc. No. 130, ¶¶ 63-65; Doc.

No. 127, ¶ 48; Doc. No. 128, ¶¶ 8-9; Doc. No. 111-11; Doc. No. 111-1, ¶ 6(a). Raytheon has not,

at the very least, met its burden of demonstrating entitlement to summary judgment based on the "Vendor Item Control" marking on the drawings of the subject rod end.

### E. RBC Took Extensive Measures to Maintain the Secrecy of Its Design.

Raytheon contends that RBC has no trade secret because RBC failed to take steps to maintain the secrecy of its design. Raytheon's entire argument that RBC failed to take reasonable security precautions is based on RBC's failure to affirmatively raise an issue when Raytheon affixed the "Vendor Item Control" and "Raytheon Proprietary" marks on the final drawing containing RBC's trade secret. *See* MOL, at 13. As set forth above, the "Vendor Item Control" marking is not what Raytheon contends. Section III., D. *supra.* And further, Raytheon's use of the "Raytheon Proprietary" mark on the drawings is actually in line with Raytheon's obligations under the PIA to treat and protect RBC's trade secret as it would its own. Doc. No. 111-1, ¶ 6(a).

RBC did, in fact, take more than ample steps to protect its trade secrets. Doc. No. 130, ¶¶ 1 to 13. The owner of a trade secret must take reasonable security precautions to maintain its secrecy. *See Proctor Grp. Ins.*, 2008 WL 2875452 at *3. "[E]fforts to preserve secrecy are measured by a standard of 'reasonableness, not perfection.'" *Diomed, Inc.*, 417 F. Supp. 2d at 144 (quoting *TouchPoint Sols., Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 30 (D. Mass. 2004)); *see also Harvard Apparatus Inc. v. Cowen*, 130 F. Supp. 2d 161, 175-176 (D. Mass. 2001). Generally, the question of whether reasonable precautions have been taken is must be resolved by the jury. *See DUSA Pharm., Inc. v. Biofrontera Inc.*, 2020 WL 5995979, at *3 (D. Mass. Oct. 9, 2020). Here, RBC has taken all of these same measures, and more, in an effort to maintain the secrecy of its rod end design, including the following:

- RBC entered into nondisclosure agreements with all entities that would be privy to the rod end design, including Raytheon, Klune, and Multicut. Doc. No. 111-1; Ex. 15, Doc. No. 126-15; Ex. 16, Doc. No. 126-16; Doc. No. 128, ¶¶ 7, 16, 18.

- RBC entered into an exclusive long-term supply agreement with Klune, Raytheon's initial wing assembly vendor, providing further protection to RBC's trade secret. Ex. 17, Doc. No. 126-17; Doc. No. 128, ¶ 16.

- 

- Emails RBC sent to Raytheon which contain information regarding the rod end design included a warning that the email contained confidential information. *See e.g.* Ex. 19, Doc. No. 126-19; Ex. 27, Doc. No. 126-27.

- CD drawings RBC sent to Raytheon containing the rod end design featured a warning that the information in the drawings was confidential and proprietary. *See e.g.,* Ex. 18, Doc. No. 126-18.

- RBC's standard employment agreement contains provisions on the sensitivity of RBC's information and the importance of maintaining confidentiality. Ex. 20, Doc. No. 126-20; Doc. No. 128, ¶ 6.

- RBC provides training to its employees as to what constitutes confidential information and trade secrets, and various ways to protect confidential information, including requiring nondisclosure agreements and long-term exclusive supply agreements. *See* Doc. No. 126-12, I 40:23-43:8, II 83:20-84:7; Doc. No. 128, ¶ 6; Doc. No. 127, ¶ 50; Doc. No. 126-4, 74:16-75:4.

- RBC's standard Terms and Conditions of Sale referenced in RBC's quote to Raytheon for sample rod ends explicitly states RBC retains all intellectual property rights related to its products, including trade secret protection. Ex. 21, Doc. No. 126-21; Doc. No. 37, 3-4; Doc. No. 128, ¶ 11.

Based on the foregoing, Raytheon has fallen far short of establishing that RBC failed to take reasonable precautions to protect the secrecy of its rod end design. Completely ignoring the PIA with RBC, Raytheon states "RBC did not take *any reasonable measures* to keep the information as its secret." MOL, at 13 (emphasis added); *see also* Doc. No. 111-1. This contention is both directly at odds with undisputed facts and contrary to law. *See USM Corp. v. Marson Fastener Corp.*, 393 N.E.2d 895, 901 (Mass. 1979) (noting that "nondisclosure agreements [are] a primary and essential precaution"). At a minimum, even if Raytheon had met its initial burden on summary judgment, the lengthy list of security measures RBC implemented raises a dispute over genuine issues of material fact.

## F.  RBC Did Not Grant Intellectual Property Rights to Raytheon through Raytheon's General Terms and Conditions.

Raytheon argues summary judgment should be granted because, by operation of its general terms and conditions ("T&Cs") (Doc. No. 111-15), referenced on Raytheon's form purchase order and accessible through a URL, RBC gave up its rights to any trade secrets in the rod end design. MOL, at 17-18. The evidence offered in support of its argument is Raytheon's April 27, 2015 purchase order ("2015 PO"), issued to RBC for 24 sample rod ends. Doc. No. 111-14. According to Raytheon, because the T&Cs are referenced in the 2015 PO, once RBC shipped the sample rod ends to Raytheon, RBC "accepted" the T&Cs and forfeited its proprietary rights in any trade secret RBC had in the sample rod ends.  MOL, at 17-18.

Summary judgment must be denied because numerous material facts are in dispute as to (i) whether the form T&Cs referenced in the 2015 PO supersede the clear and unambiguous terms of the PIA (not mentioned by Raytheon in its analysis), which the parties specifically negotiated to protect their respective rights in their own trade secrets, and which obligates both parties to respect and protect the other party's trade secrets, (ii) whether the 2015 PO and the form T&Cs were intended by the parties as a modification or amendment of the PIA, especially in light of the non-modification clause in the PIA, and (iii) if the PIA is, in fact, superseded by the 2015 PO and the T&Cs, whether RBC "accepted" the T&Cs, as the term is defined under Massachusetts' UCC, Mass. Gen. Laws ch. 106, § 2-207, thus forfeiting its trade secrets to Raytheon.

Critically, Raytheon fails to even mention the existence of the PIA in its argument that RBC waived its property rights. The PIA was executed by the parties specifically to allow them to share and protect their intellectual property in conjunction with the SDB II program. Doc. No. 111-1, Recitals.  Ignoring the PIA, Raytheon makes the outlandish assertion that, despite the specific protective rights articulated in the PIA, RBC nevertheless turned over to Raytheon all of RBC's property rights in its rod end design simply by "accepting" the T&Cs in Raytheon's form purchase

19

order. Whether RBC intended for the 2015 PO and the form T&Cs to supersede the PIA is a question of fact which the parties clearly dispute and prevents summary judgment.[7]

In addition, the PIA includes a strict non-modification clause preventing the parties from changing their rights under the PIA in the manner Raytheon contends happened with its T&Cs: "[t]his Agreement may not be amended or modified except by subsequent agreement *in writing executed by a duly authorized officer or representative of each party.*" Doc. 111-1, ¶ 14 (emphasis added). For RBC to forfeit its intellectual property rights, as Raytheon contends, the undisputed facts must demonstrate the 2015 PO/T&Cs meet the writing requirements for modification or amendment of the PIA. The facts actually demonstrate that neither the 2015 PO nor Raytheon's T&Cs contains an agreement to modify or amend the PIA, and neither of the documents makes reference to the PIA or RBC's rights thereunder. Doc. Nos. 111-14 and 111-15. Neither includes signatures of Raytheon's or RBC's authorized officers or representatives, as required by the PIA.[8]

Even if Raytheon could demonstrate no disputed issues of fact exist as to whether RBC's protections in the PIA were superseded, modified or amended by the 2015 PO and the T&Cs – which it has not – Raytheon's argument that RBC forfeited its proprietary rights in the rod end design – rights which were indisputably protected by the PIA – by "accepting" Raytheon's T&Cs when RBC sold sample rod ends to Raytheon in 2015, also relies on disputed issues of material fact precluding summary judgment. Doc. No. 130, ¶¶ 66-75. Raytheon relies on one document[9] –

---

[7] On the issue of intent, the fact that RBC has expressly implemented a policy to prevent customers from being able to claim, as Raytheon is here, that by merely fulfilling a purchase order RBC accepts the customer's terms and conditions, is a strong evidence that RBC did not intend to do so here. *See* Doc. No. 128, ¶ 15.

[8] To the extent Raytheon contends RBC's customer service staff were authorized to modify or amend the PIA by accepting the 2015 PO, only certain key management personnel have authority to agree to such a relinquishment of rights on behalf of RBC. Doc. No. 130, ¶ 76; Doc. No. 128, ¶ 14.

[9] Raytheon also offers as undisputed "evidence" RBC's purported admission, in its Reply Memorandum filed in connection with the Motion to Transfer Venue (Doc. No. 40) ("Reply"), that RBC "admits it accepted Raytheon's terms and conditions" in the 2015 PO. MOL, at 18. The Reply does not – as Raytheon grossly overstates – admit RBC accepted Raytheon's draconian T&Cs. Raytheon also ignores that, in its own Opposition to Motion to Transfer Venue, Raytheon took the opposite position from what it now takes as to which documents constituted the "offer" and "acceptance" of a sale of sample rod ends: when RBC sent its Quote on April 24, 2015, "Raytheon's personnel in

20

the 2015 PO – as the "undisputed factual support," but Raytheon fails to reference numerous disputed facts as to whether the 2015 PO constituted an "offer" under the Massachusetts UCC, and whether RBC's shipment of sample rod ends constituted "acceptance" of all the T&Cs, or whether Raytheon's T&Cs constituted a material alteration of the contractual terms between the parties, necessitating exclusion from any contract between the parties. The following documents raise disputed material issues of fact:

- On 4/24/2015, RBC issued Quote # 10/0466008 to Raytheon for the sample rod ends ("Quote"). Doc. No. 37, at 3-4. The Quote includes all material terms of an offer, including price, quantity, shipping instructions, payment terms, part numbers, lead times and an expiration date for the offering terms. *Id.* RBC contends this Quote is the "offer" that Raytheon then accepted by issuing the 2015 PO. *See Liddell Bros., Inc. v. Impact Recovery Sys., Inc.*, 2016 WL 1091065, at *5 (D. Mass. Mar. 21, 2016) (quote may be an offer to sell where "it is sufficiently specific and tailored for an individual offeree"); *Loranger Const. Corp. v. E. F. Hauserman Co.*, 384 N.E.2d 176 (Mass. 1978) (same).

- The Quote also incorporates by reference RBC's standard terms and conditions ("RBC's T&Cs"), accessible at a designated URL. Doc. No. 37, 17 4. RBC's T&Cs clearly state that RBC retains all of its trade secrets and proprietary rights in the parts, and that RBC objects to and rejects in advance any additional or contrary terms and conditions included by the purchaser in connection with the sale of parts. Doc. No. 126-21.



- On 5/19/2015, RBC shipped the sample rod ends and issued an invoice to Raytheon ("Invoice"), again, including the same material terms as set forth in the Quote. Doc. No.

Arizona *accepted the offer* by sending a purchase order on April 27, 2015." Doc. No. 35 at 7 n.3 (emphasis added). Raytheon thus "admitted" RBC's Quote was an offer and Raytheon's 2015 PO was an acceptance which, if taken at face value, leads to the conclusion that *RBC's T&Cs* in its Quote control whether RBC retained its trade secrets and proprietary information. At the very least, the respective "admissions" made by the parties in briefing the Motion to Transfer Venue raise material questions of fact as to whether the Quote or the 2015 PO or the Invoice constituted offers, acceptances, counteroffers or none of the above.

41, at 4-5. The Invoice also incorporates by reference RBC's T&Cs, which – as set forth above – expressly state RBC retains all of its proprietary rights and that RBC will not accept any additional or contrary terms to its agreement.[10]

At the very least, "[t]his case [presents] a 'classic "battle of the forms" sale, in which a buyer and a seller each attempt to consummate a commercial transaction through the exchange of self-serving pre-printed forms that clash, and contradict each other, on both material and minor terms.'" *Softub, Inc. v. Mundial, Inc.*, 53 F. Supp.3d 235, 249 (D. Mass. 2014). Raytheon has failed to demonstrate that no material factual issues are in dispute regarding whose form is an offer or acceptance, whether forms were simply counteroffers, whether RBC "accepted" Raytheon's T&Cs, and whether Raytheon's T&Cs, including the forfeiture language, materially altered any contract under Mass. Gen. Laws ch. 106, § 2-207(2). *See Sibcoimtrex, Inc. v. Am. Foods Group, Inc.*, 241 F. Supp. 2d 104, 109 (D. Mass. 2003) (determining whether terms have been materially altered is "a fact specific, case-by-case analysis to determine whether a proposed term should become a part of the parties' contract"). Summary judgment on this basis must be denied.

## G. Counts II and III Are Not Barred by the Applicable Statutes of Limitations.

Raytheon seeks summary judgment on RBC's misappropriation claims (Counts II and III), and the related declaratory judgment claim (Count V) on the grounds that, according to Raytheon, RBC commenced this Action more than three years after RBC knew Raytheon had misappropriated its trade secrets. MOL, at 19-20. In support of this argument, Raytheon asserts (i) the undisputed fact that Raytheon sent to RBC, on April 22, 2015, a copy of the Raytheon drawing incorporating RBC's trade secrets, marked as a "Vendor Item Control Drawing,"

---

[10] Raytheon asserts that RBC cannot rely on the Invoice because, according to Raytheon, the Invoice was "dated *after* shipment of the rod end bearings." MOL, at 18 n.8 (emphasis in original). The email exchange on which Raytheon relies – Doc. No. 111-16 – is dated May 18, 2015; however, in the email, RBC's Andrup states to Raytheon's Willett:

"Raytheon Proprietary," and "Copyright 2015 Raytheon Company" (*Id.*), and (ii) the disputed material fact that, according to Raytheon, RBC knew from these markings that Raytheon intended to share the drawing with RBC's competitors, claiming RBC's McNeil admitted as much in an email dated April 10, 2015 (Doc. No. 111-7) and in his deposition testimony (Doc. No. 111-5). Raytheon's argument and characterization of the facts are incorrect.

Under Massachusetts law, tort claims for misappropriation of trade secrets "shall be commenced only within three years next after the cause of action accrues." Mass. Gen. Laws ch. 260, § 2A; *see also Astellas Inst. for Regenerative Med. v. ImStem Biotechnology, Inc.*, 458 F. Supp. 3d 95, 106 (D. Mass. 2020). "The Massachusetts common law 'discovery rule' provides that the statute of limitations is tolled 'until a plaintiff knows, or reasonably should have known, that it has been harmed or may have been harmed by the defendant's conduct.'" *Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.,* 412 F.2d 215, 238 (1st Cir. 2005), *cert. denied*, 547 U.S. 1147 (2006) (quotations omitted). "Where compliance with a statute of limitations is at issue, 'factual disputes concerning when a plaintiff knew or should have known of his cause(s) of action are to be resolved by the jury.'" *Astellas*, 458 F. Supp. 3d at 107 (quoting *Patsos v. First Albany Corp.*, 741 N.E.2d 841, 847 (Mass. 2001)); *see also McIntyre v. United States*, 367 F.3d 38, 52 (1st Cir. 2004). "Ultimately, the question of when a plaintiff should have known and when a plaintiff should have asserted her rights, are questions of fact 'often unsuited for summary judgment' unless 'the facts regarding discovery of harm are undisputed.'" *Astellas,* 458 F. Supp. 3d at 107 (quoting *Stanley v. Schmidt*, 369 F. Supp. 3d 297, 314–15 (D. Mass. 2019)).

As addressed above, RBC did not "understand" Raytheon's marking of the rod end drawing as "Vendor Item Control" or "Raytheon Proprietary" to mean Raytheon intended to send the drawing with RBC's trade secrets to RBC's competitors outside the restrictions of the PIA; nor do the markings Raytheon included on the various drawings constitute actual or constructive notice to RBC. *See* Section III., D., *supra*. RBC reasonably believed its trade secrets were protected by

23

the PIA and would be shared only with Raytheon's wing assembly vendor(s) in accordance with the PIA. *Id.;* Doc. No. 130, ¶¶ 78-80. In fact, within days of Raytheon's issuance of final drawing, RBC quoted, and Raytheon purchased, sample rod ends incorporating RBC's proprietary design, making clear to RBC that Raytheon intended to use RBC's design and RBC's products in its wing assemblies. Doc. No. 130, ¶ 66; Doc. No. 37, at 3-4; Doc. No. 111-14.

entered into an NDA with Multicut in February 2017 before RBC shipped product to Multicut for the SDB II. Doc. No. 126-16. Once again, RBC understood that its trade secrets would be similarly protected by the execution of its NDA with Multicut as part of the closed loop of mutual NDAs between all parties connected to the SDB II program. Doc. No. 128, ¶¶ 7, 9, 16, 18, 19.

RBC could not have known of potential misappropriation of its trade secret by Raytheon until 2017 at the earliest.



In short, Raytheon has failed to demonstrate RBC could have known Raytheon and Multicut had misappropriated RBC's trade secret and were taking steps to find a cheaper source for the rod ends before RBC received the email from RBC France with the Multicut drawing. Even then, it was not until June 2017 at the earliest, when RBC compared the Multicut drawings to RBC's drawings confirming that RBC's proprietary design was in the Multicut drawing, that RBC could have known of the potential for claims against Multicut and Raytheon. This Action was commenced on May 8, 2020, well within the three-year statute of limitations. At the very least, material issues of fact exist regarding what and when RBC should have known about the misappropriation of its trade secret and summary judgment on this point must be denied.

## IV.    CONCLUSION

For all the foregoing reasons, RBC requests that Raytheon's Motion for Summary Judgment be denied in its entirety.

Respectfully submitted,

PLAINTIFF ROLLER BEARING
COMPANY OF AMERICA, INC.


By /s/ *James F. Radke*
James F. Radke, BBO# 667299
MURTHA CULLINA LLP
99 High Street, 20th Floor
Boston, MA 02110
Tel: (617) 457-4130
jradke@murthalaw.com

Lorey Rives Leddy (PHV)
Richard J. Basile (PHV)
MURTHA CULLINA LLP
107 Elm Street, 11th Floor
Stamford, CT 06902
Tel: (203) 653-5400
lleddy@murthalaw.com
rbasile@murthalaw.com

25

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2022, a copy of the foregoing was filed electronically

[and served by mail on anyone unable to accept electronic filing]. Notice of this filing will be sent

by e-mail to all parties by operation of the Court's electronic filing system [or by mail to anyone

unable to accept electronic filing]. Parties may access this filing through the Court's system.

Elizabeth A. Alquist
Woo Sin Sean Park
DAY PITNEY LLP
242 Trumbull Street
Hartford, CT 06103
eaalquist@daypitney.com
wpark@daypitney.com

Jonathan I. Handler
DAY PITNEY LLP
One International Place
Boston, MA 02110
jihandler@daypitney.com

/s/ *James F. Radke*
James F. Radke