UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ROLLER BEARING COMPANY OF AMERICA, INC., | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:20-cv-10889-IT |
| | * | |
| RAYTHEON COMPANY, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

November 3, 2023

TALWANI, D.J.

In 2015, Defendant Raytheon Company ("Raytheon") solicited Plaintiff Roller Bearing Company of America, Inc. ("Roller Bearing") to help develop a rod end bearing for use in Raytheon's work on the Department of Defense Small Diameter Bomb II ("SDB II") program. The rod end bearing needed to be able to withstand highly corrosive conditions, and Raytheon discovered during testing that its original bearing design was not sufficient. Raytheon worked with Roller Bearing to develop a new bearing design that could meet the specifications of the Small Diameter Bomb without corroding during extended exposure.

The parties exchanged iterations of the rod end bearing design through a series of documents referred to by the parties as "Vendor Item Control Drawings." Several years later, Raytheon switched rod end bearing suppliers and sent one of these drawings to another manufacturer, Multicut North America ("Multicut"). Roller Bearing alleges in its Amended Complaint [Doc. No. 21] that, by sharing this drawing with Multicut, Raytheon (1) breached contractual obligations of its Proprietary Information Agreement with Roller Bearing; (2) violated the Defend Trade Secrets Act, 28 U.S.C. § 1836; (3) misappropriated Roller Bearing's

trade secrets under M.G.L. c. 93 §§ 42, et seq.; and (4) breached the implied covenant of good

faith and fair dealing. Roller Bearing seeks monetary damages, injunctive relief, and a

declaratory judgment against Raytheon under 28 U.S.C. § 2201.

Pending before the court is Raytheon's Motion for Summary Judgment [Doc. No. 114].

For the following reasons, the motion is DENIED.

## I.    Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate

when "the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under

the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st

Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving

party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute

of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied

in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-

moving party's claim or (2) by demonstrating that the non-moving party failed to establish an

essential element of its claim. Id. at 323-24.

Once the moving party establishes the absence of a genuine dispute of material fact, the

burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of

material fact remains. Id. at 325. The non-moving party cannot oppose a properly supported

summary judgment motion by "rest[ing] on mere allegations or denials of [the] pleadings."

Anderson, 477 U.S. at 248. Rather, the non-moving party must "go beyond the pleadings and by

[his or] her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

## II.     Factual Background[1]

Raytheon is a multinational corporation that develops and manufactures aerospace products in the commercial aerospace and defense industries. Amended Complaint ("Am. Compl.") ¶ 10 [Doc. No. 21]. Raytheon was contracted by the U.S. Department of Defense to work on its SDB II program. Id. ¶ 12. Roller Bearing designs, manufactures, and distributes engineering products and bearings for the aerospace industry. Am. Compl. ¶ 1 [Doc. No. 21].

In 2014, Raytheon and Roller Bearing entered into a Proprietary Information Agreement ("PIA") related to the SDB II program. Id. The PIA defines Roller Bearing "proprietary information" as "certain proprietary information related to bearing performance and production." Decl. of Elizabeth Alquist in Opp'n to Raytheon's Mot. for Summary Judgement ("Alquist Decl."), Ex. 1 [Doc. No. 111-1]. The PIA requires that "[i]n order for information to be afforded

---

[1] Both parties submitted Statements of Material Facts [Docs. No. 115, 130, 140, 141]. The court recites facts that are either undisputed in the parties' filings or, if disputed, as presented by non-movant Roller Bearing. See Griggs-Ryan, 904 F.2d. at 115.

protection under [the PIA], the disclosing party ('Discloser') shall identify any Proprietary Information disclosed by it hereunder as follows: (i) all documents and other tangible materials shall be marked with an appropriate restrictive legend which indicates the proprietary nature of the material and the Discloser's interest therein such as, by way of example 'Proprietary' in combination with Discloser's name[.]" Id. at ¶ 2(a)(i). The PIA further specified that "all other disclosures made by the Discloser must be identified as proprietary at the time of disclosure and must thereafter be reduced to a written listing or summary marked with an appropriate restrictive legend and delivered to Recipient within one (1) month after the initial disclosure." Id. at ¶ 2(a)(ii).

The PIA imposes the following obligation on the Recipient:

[w]ith respect to Proprietary Information disclosed in accordance with the requirements of Section 2 above, the Recipient, for the period [from September 10, 2014, through September 10, 2024] and except as otherwise provided below, will (as to Discloser's Proprietary Information):

(a) hold it in confidence from the date of receipt under this Agreement;

(b) use it only for the purposes specified above in the recitals in connection with the use of the Discloser's Proprietary Information and/or for such other purposes as may be subsequently authorized in writing by Discloser;

(c) make it available, . . . only (i) to its employees who have a need to know in order to carry out their duties in connection with the purposes specified above and who have suitable obligations of confidentiality applicable to such Proprietary Information and (ii) to certain other parties as specified in Section 6 below; and

(d) not otherwise use or disclose it except as expressly authorized in this Agreement or except as otherwise authorized in writing by the Discloser . . .

Id. at ¶ 3(a)-(d). Section 6, in turn, provides that: "Recipient's obligations under Section 3 of this Agreement with respect to the protection of Discloser's Proprietary Information shall be to use the same reasonable degree of care which Recipient uses to protect its own information of

similar character  . . .” Id. at ¶ 6(a). Notwithstanding this provision, the PIA provides further that:

“Recipient may disclose Discloser's Proprietary Information to vendors and subcontractors to the

extent required in connection with the purpose specified above provided that such vendors and

subcontractors have undertaken written obligations to protect Discloser's Proprietary

Information in a manner at least as protective as the provisions of this Agreement or in such

other form approved in writing by the Discloser.” Id. at ¶ 6(b)(iii).

      The PIA also provides that the parties do not have obligations under the PIA to protect

“information which, at the time of disclosure by Discloser to Recipient hereunder, is in the

public domain”; “information which, after disclosure by Discloser to Recipient hereunder,

becomes part of the public domain through no fault of Recipient”; “information which was

rightfully in the Recipient's possession at the time of disclosure by Discloser to Recipient

hereunder and which is not subject to prior continuing obligations of confidentiality by Recipient

to Discloser”; or “information which has been or is hereafter released by Discloser to others

without restriction[.]” Id. at ¶ 4(a)-(e).

      The PIA also includes an integration clause that reads:

> Unless otherwise subsequently agreed in writing by the parties, this Agreement
> supersedes any conflicting provisions of any prior written or oral agreements
> or understandings between the parties related to the protection of the subject
> Proprietary Information. This Agreement may not be amended or modified
> except by subsequent agreement in writing executed by a duly authorized
> officer or representative of each party.

Id. at ¶ 14.

      While working on the SDB II's wing deployment functionality, Raytheon determined that

the wing assembly's rod end bearings required a design change. Raytheon asked whether Roller

Bearing could supply certain rod end bearings for the SDB II project. Pl.'s Resp. to Mat. Facts

¶ 4 [Doc. No. 130]. Roller Bearing responded that it did not have the bearings Raytheon

requested in stock, id., and Raytheon indicated it "[might] have to look at custom rod ends if an off the shelf solution is not possible." March 23, 2015 Email, Alquist Decl., Ex. 2 [Doc. No. 111-2].

In April 2015, Raytheon and Roller Bearing exchanged communications regarding a custom rod end bearing. First, Raytheon sent to Roller Bearing a document referenced here as the "Initial Vendor Item Control Drawing" for a rod end bearing based on a two-piece design by New Hampshire Ball Bearing, another aerospace manufacturer. Pl.'s Resp. to Mat. Facts ¶ 5 [Doc. No. 130]; Initial Vendor Item Control Drawing, Alquist Decl., Ex. 3 [Doc. No. 111-3]. The drawing was marked "PRELIMINARY FOR ENGINEERING USE ONLY" and included various markings and notations, including "COPYRIGHT 2015 RAYTHEON COMPANY"; "VENDOR ITEM CONTROL DRAWING"; and "THIS DRAWING DEFINES THE SELECTION CRITERIA FOR PROCUREMENT OF AN EXTERNALLY THREADED ROD END BEARING." Initial Vendor Item Control Drawing, Alquist Decl., Ex. 3 [Doc. No. 111-3]. It also was marked "RAYTHEON PROPRIETARY" (in two places), with the further notation that:

> THIS DOCUMENT CONTAINS PROPRIETARY DATA OR INFORMATION . . . DEVELOPED OR ACQUIRED AT THE PRIVATE EXPENSE OF THE RAYTHEON COMPANY AND IS RESTRICTED TO USE ONLY BY PERSONS AUTHORIZED BY RAYTHEON IN WRITING TO USE IT. DISCLOSURE TO UNAUTHORIZED PERSONS WOULD LIKELY CAUSE SUBSTANTIAL COMPETITIVE HARM TO RAYTHEON'S BUSINESS POSITION. NEITHER SAID DOCUMENT NOR SAID TECHNICAL DATA OR INFORMATION SHALL BE FURNISHED OR DISCLOSED TO OR COPIED OR USED BY PERSONS OUTSIDE RAYTHEON WITHOUT THE EXPRESS WRITTEN APPROVAL OF RAYTHEON.

The following day, Roller Bearing's sales representative forwarded Raytheon's Initial Vendor Item Control Drawing to Scott McNeil, one of Roller Bearing's engineers. Pl.'s Resp. to

Mat. Facts ¶ 8 [Doc. No. 130]. On that day or the next, McNeil reviewed the document. McNeil Depo. Tr. 47:5-14; 49:15-21, Alquist Decl., Ex. 5 [Doc. No. 111-5].

A few days later, McNeil sent a revised drawing back to Raytheon. Roller Bearing Marked Vendor Item Control Drawing, Alquist Decl., Ex. 8 [Doc. No. 111-8]. That drawing was identical to the Initial Vendor Item Control Drawing with the addition of handwritten annotations by McNeil. Id. The annotations: (1) proposed a different material for the bearing housing; (2) proposed a different material for the ball; (3) proposed a specific film coat for the ball; (4) added "Heat treatment of ball & rod end per AWS 2759 or AMS-H-6875" and "max radial play ball/body .003 inch" to Marking Requirements; (5) noted "thread may be turned, ground, or rolled" under thread specifications in the center of the drawing; and (6) added "Alternate Proposal, marked up by: Scott McNeil, P.E., RBC Bearings Aerospace Tech. Development Mgr., furnished to Raytheon under RBC Bearings-Raytheon NDA, confidential and proprietary material of RBC Bearings." Id.

Two days later, John Andrup, a senior account manager at Roller Bearing, asked McNeil if he could ████████████████████—the particular brand of dry film lubricant Roller Bearing had decided to use on the bearing—███████████████████ because ███ █████████████████████ to be sent to Raytheon. April 7, 2015 Email, Alquist Decl., Ex. 9 [Doc. No. 111-9]. McNeil replied that Andrup ██████████████████ ███████████ but asked that he ███████████████ Id.

Later that month, Raytheon sent a revised drawing, which Raytheon refers to here as the "Intermediate Vendor Item Control Drawing," back to Roller Bearing. Intermediate Vendor Item Control Drawing, Alquist Decl., Ex. 10 [Doc. No. 111-10]. The Intermediate Vendor Item Control Drawing accepted McNeil's proposals from the Roller Bearing Marked Vendor Item

Control Drawing and included additional information from Raytheon, including load bearing and passivation requirements that were not disclosed in the Initial Vendor Item Control Drawing. Id. The Intermediate Vendor Item Control Drawing was marked again as "RAYTHEON PROPRIETARY" with the language quoted above and "COPYRIGHT 2015 RAYTHEON COMPANY." Id. Later that day, McNeil sent an email to Ken Giuntoli, Roller Bearing's Business Development Manager, responding to his request that someone review the drawing for accuracy. Id. McNeil wrote that the drawing "[l]ooks good." Id. Roller Bearing did not annotate or request alterations to the Intermediate Vendor Item Control Drawing.

A few days later, Raytheon sent Roller Bearing a further revised drawing, referred to here as the "Final Vendor Item Control Drawing." Final Vendor Item Control Drawing, Alquist Decl., Ex. 11 [Doc. No. 111-11]. The Final Vendor Item Control Drawing is identical to the Intermediate Vendor Item Control Drawing, except it removes the "Preliminary" marking. Id. It, too, is marked as "RAYTHEON PROPRIETARY" with the above-quoted language and "COPYRIGHT 2015 RAYTHEON COMPANY." Id. After receiving the Final Vendor Item Control Drawing, Ben Anderson, a Roller Bearing Senior Application Engineer, told John Willet, an engineer at Raytheon, that Anderson had "received the updated Raytheon drawing and it looks good." April 27, 2015 Email, Alquist Decl., Ex. 12 [Doc. No. 111-12]. Roller Bearing did not request that the Final Vendor Item Control Drawing be marked with Roller Bearing's proprietary legend.

Meanwhile, also in April 2015, McNeil sent an in-house patent request for the rod end bearing to John Cowles, the director of Roller Bearing's New Product Development Group. McNeil Depo. Tr. 233:1-7, Alquist Decl., Ex. 5 [Doc. No. 111-5]. McNeil "was concerned that Raytheon might take [Roller Bearing's] design after [it] proved it out and showed them that it

would work, and [Raytheon] wouldn't honor the PIA and they were going to put all [Roller Bearing's] information on their drawing and send it to other companies, competitors, to manufacture it." Id. at 234:8-12.

On April 24, 2015, Roller Bearing sent Raytheon a quote for the initial test purchase of the rod end bearing. Pl.'s Resp. to Mat. Facts ¶ 19 [Doc. No. 130]. A few days later, Raytheon sent a Purchase Order to Roller Bearing for twenty-four rod end bearings. Purchase Order, Alquist Decl., Ex. 14 [Doc. No. 111-14].

On either May 18 or 19, 2015, Roller Bearing shipped the rod end bearings to Raytheon. Pl.'s Resp. to Mat. Facts ¶ 22 [Doc. No. 130]. Roller Bearing provided Raytheon an Invoice for the purchase on May 19. Id.; Invoice [Doc. No. 41].

Following Raytheon's test purchase, Raytheon shared with Klune Industries ("Klune") the Final Vendor Item Control Drawing and purchased the rod end bearings from Klune. Pl.'s Resp. to Mat. Facts ¶ 23 [Doc. No. 130]. Roller Bearing did not object to Raytheon sharing the drawing with Klune, with whom Roller Bearing had both a non-disclosure agreement and an exclusive long-term supply agreement for the rod end bearings. See Klune-Roller Bearing NDA, Decl. of Lorey Rives Leddy in Opp'n to Raytheon's Mot. for Summary Judgment ("Leddy Decl."), Ex. 15 [Doc. No. 126-15]; see also Klune-Roller Bearing LTA, Leddy Decl., Ex. 17 [Doc. No. 126-17].

In 2017, Raytheon switched wing assembly suppliers from Klune to Multicut North America, Inc. ("Multicut"). Pl.'s Resp. to Mat. Facts ¶ 24 [Doc. No. 130]. Raytheon shared the Final Vendor Item Control Drawing with Multicut. Id. Before sending any of the subject rod end bearings to Multicut, Roller Bearing and Multicut entered into an NDA. Multicut-Roller Bearing NDA, Leddy Decl., Ex. 16 [Doc. No. 126-16].

On May 9, 2017, Roller Bearing's affiliate, Roller Bearing France, forwarded to Roller Bearing an email from a Danish distributor called Nomo DK seeking a quote for certain parts via drawings marked with a Multicut logo. Pl.'s Resp. to Mat. Facts ¶ 81 [Doc. No. 130]. Ken Giuntoli believed he recognized the part number referenced on the drawings as the rod end that Roller Bearing had designed for Raytheon. Id. at ¶ 82. Giuntoli then asked one of Roller Bearing's engineers to determine whether the emails and drawings from Nomo DK included Roller Bearing's trade secrets. Id. at ¶ 83. On June 30, 2017, the engineer advised Giuntoli that the drawing was identical to the Raytheon drawing containing Roller Bearing's design. Id. at ¶ 84.

On July 11, 2017, Roller Bearing submitted a provisional patent application for the rod end bearing to the U.S. Patent and Trademark Office. Patent, Alquist Decl., Ex. 20 [Doc. No. 111-20].[2]

### III.   Discussion

Roller Bearing brings claims for breach of Raytheon and Roller Bearing's PIA (Count I), misappropriation of trade secrets in violation of the Defend Trade Secrets Act (Count II) and M.G.L. c. 93 §§ 42, et seq. (Count III),[3] breach of the covenant of good faith and fair dealing (Count IV), and for declaratory judgment (Count V). Amended Complaint [Doc. No. 21]. Raytheon seeks summary judgment on all counts on the grounds that (1) Roller Bearing does not possess a valid trade secret in the rod end bearing design; (2) Roller Bearing sold Raytheon the rod end bearings without restriction; (3) Roller Bearing's claims are barred by the applicable

---

[2] The patent issued on September 29, 2020. Id. Roller Bearing has not asserted the patent in this action.

[3] The Amended Complaint [Doc. No. 21] mentions a misappropriation of trade secrets claim under Massachusetts common law in the Preamble but does not include that claim in a cause of action.

statutes of limitations; and (4) Massachusetts does not recognize an independent claim for the breach of the covenant of good faith and fair dealing. Raytheon Company's Mot. for Summary Judgment ("Motion") [Doc. No. 114]. The court begins with the trade secrets claims before turning to the breach of contract claims.

A.   *Trade Secrets (Counts II and III)*

1.   Applicable Statutes of Limitations

As an initial matter, Raytheon argues that both of Roller Bearing's trade secrets claims are time-barred by their respective statutes of limitations. Raytheon Company's Mem. in Supp. of its Mot. for Summ. J. (Def.'s Mem.) 19-20 [Doc. No. 116]. The Defend Trade Secrets Act requires that actions alleging misappropriation of trade secrets be commenced within three years of when the misappropriation was discovered or should have been discovered through the exercise of reasonable diligence. 18 U.S.C. § 1836(d). Claims for misappropriation of trade secrets under Massachusetts law also have a three-year statute of limitations. See Stark v. Advanced Magnetics, Inc., 50 Mass. App. Ct. 226, 232 (2000) ("Actions for . . . misappropriation of trade secrets . . . must be brought within three years after the cause of action accrues") (citing M.G.L. c. 260, § 2A). A cause of action for a misappropriation of trade secrets claim accrues when a reasonable person in the plaintiff's position "knows, or reasonably should have known, that it has been harmed or may have been harmed by the defendant's conduct." Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 238 (1st Cir. 2005) (quoting Taygeta Corp. v. Varian Assocs., Inc., 436 Mass. 217, 229 (2002)).

Raytheon contends that Roller Bearing knew as early as April 22, 2015—five years before this action was commenced—that Raytheon had included the alleged trade secret in its Final Vendor Item Control Drawing and that Raytheon would share the drawing with other

vendors. Def.'s Mem. 19-20 [Doc. No. 116]. Raytheon explains that a "Vendor Item Control Drawing" is a term of art in the aerospace industry when referring to "drawings with selection criteria for interchangeable items that are procurable from multiple vendors." Id. at 11; see also ASME (American Society of Mechanical Engineers) Y14.24-1999 at 21, Alquist Decl., Ex. 27 [Doc. No. 111-27] (defining Vendor Item Control Drawing as "provid[ing] an engineering description and acceptance criteria for commercial items or vendor-developed items that are procurable from a specialized segment of industry"). Raytheon claims that Roller Bearing knew, or should have known, that its Final Vendor Item Control drawing would be shared with Roller Bearing's competitors. Def.'s Mem. 19-20 [Doc. No. 116].

Raytheon points to Roller Bearing engineer Scott McNeil's testimony during his deposition that he instructed Roller Bearing engineers to keep certain details regarding the rod end bearing's design from Raytheon because he "was concerned that [his] intellectual property might be sent to a competitor." McNeil Tr. 126:4-21, Leddy Decl., Ex. 4 [Doc. No. 126-4]. Raytheon argues that this is evidence that Roller Bearing knew that its alleged trade secret was at risk of being shared with other suppliers via the Final Vendor Item Control Drawing. Raytheon also argues that Roller Bearing had "full knowledge" in April 2015 that Raytheon was asserting sole ownership of the rod bearing design because the Final Vendor Item Control Drawing was marked as "Raytheon Proprietary" and "Copyright 2015 Raytheon Company." Because Roller Bearing did not commence this suit until May 2020, Raytheon asserts that it is time-barred.

Roller Bearing counters that it did not learn of the alleged misappropriation until June 2017, when RBC France sent the Multicut drawing and Roller Bearing compared the drawing to its rod end bearing design. Opp'n to Mot. for Summ. J. ("Pl.'s Opp'n") 25 [Doc. No. 131].

12

Because the suit was filed within three years of that date, Roller Bearing contends that the trade secrets claims are not barred by the statute of limitations.

Roller Bearing also disputes Raytheon's contention that the "Raytheon Proprietary" markings on the drawing constituted actual or constructive notice to Roller Bearing that its proprietary information would be shared, and contrary to Raytheon's characterization, Roller Bearing did not understand Raytheon's use of a Vendor Item Control Drawing or its designation of the Final Vendor Item Control Drawing as "Raytheon Proprietary" to mean that Raytheon intended to send its trade secrets to competitors. Id. at 23. Instead, Roller Bearing expected that Raytheon would comply with the confidentiality requirements of the PIA and that Roller Bearing's trade secret was protected by the "closed loop of mutual NDAs" between itself, Raytheon, Multicut, and Klune. Id. at 24. McNeil testified that his instruction to Roller Bearing engineers to withhold details from Raytheon "didn't pertain just to a Vendor Item Control Drawing" but stemmed from a general concern "that Raytheon might take [Roller Bearing's] design." McNeil Tr. 126:6-21; 234:8-12, Alquist Decl., Ex. 5 [Doc. No. 111-5].

"Whether a plaintiff should have discovered a tort is a 'highly fact- and case-specific' inquiry." Astellas Institute for Regenerative Medicine v. ImStem Biotechnology, Inc., 458 F. Supp. 3d 95, 107 (D. Mass. 2020) (quoting McIntyre v. U.S., 367 F.3d 38, 52 (1st Cir. 2004)). Where the facts regarding discovery of harm are disputed, the question of when a plaintiff should have known of its injury is "often unsuited for summary judgment." Stanley v. Schmidt, 369 F. Supp. 3d 297, 314-15 (D. Mass. 2019).

Viewing the record in the light most favorable to Roller Bearing, a jury could credit Roller Bearing's argument that it understood both (1) that Raytheon was acting pursuant to the PIA and protecting information that Roller Bearing understood was proprietary and (2) that

13

Roller Bearing's information was protected by the network of NDAs between itself, Raytheon, Multicut, and Klune. Accordingly, a jury could reasonably reject Raytheon's contention that the claim accrued no later than April 2015, and find that Roller Bearing did not discover the alleged misappropriation until June 2017, making the suit timely under the applicable statutes of limitations.

          2.       Misappropriation of Trade Secrets

"The standard for misappropriation under the [Defend Trade Secrets Act] is substantially similar to that under Massachusetts law." Viken Detection Corp. v. Videray Tech. Inc., 384 F. Supp. 3d 168, 177 (D. Mass. 2019). To prevail on a claim for misappropriation of trade secrets under Massachusetts law, a plaintiff must establish three things: "1) the information at issue constitutes a trade secret, 2) the plaintiff took reasonable measures to secure the confidentiality of the information, and 3) the defendant obtained the trade secret through improper means. Id. (citing Optos, Inc. v. Topcon Medical Systems, Inc., 777 F. Supp. 2d 217, 238 (D. Mass. 2011)); see also M.G.L. c. 93, § 42(4) (defining "trade secret").

          a.       Existence of a Valid Trade Secret

The DTSA defines "trade secret" as information that (A) the owner thereof has taken reasonable measures to keep secret; and (B) derives independent economic value from not being known to, and not being readily ascertainable through proper means by, another person who could derive economic value from the information's disclosure or use. 18 U.S.C. § 1839(3)(A); see Allstate Insurance Co. v. Fougere, 79 F.4th 172, 188 (1st Cir. 2023). Similarly, under Massachusetts law, "[a] trade secret is any confidential information used in the plaintiff's business that 'gives [the owner] an advantage over competitors who do not know or use it.'" Viken Detection Corp., 384 F. Supp. 3d at 177 (quoting J.T. Healy & Son, Inc. v. James A.

Murphy & Son, Inc., 357 Mass. 728, 736 (1970)). Matters of public knowledge or information generally known in an industry are not protectable trade secrets. Id. "A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design, and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." Iconics, Inc. v. Massaro, 266 F. Supp. 3d 449, 454 (D. Mass. 2017) (quoting Integrated Cash Mgmt. Servs. v. Digital Transactions, Inc., 920 F.2d 171, 174 (2d Cir. 1990)).

Roller Bearing alleges that it possesses a protectable trade secret in "the design of a rod end loader slot bearing with a novel combination of materials and features for use in aircraft applications with harsh environments, such as the wing assembly of Raytheon's SDB II." Pl.'s Opp'n 3 [Doc. No. 131]. Specifically, Roller Bearing identifies six individual design features chosen "based on decades of engineering and rod designing experience" and "resulting in [Roller Bearing's] trade secret design." Id. at 5. These features are: (1) the ball material; (2) the material and heat treatment of the housing for the rod end; (3) the use of solid film lubricant; (4) the maximum radial play; (5) the load rating; and (6) the passivation of the rod end.[4] Id. at 5-10; see also Plaintiff's Resp. and Objections to Def.'s First Set of Interrogatories 4, Alquist Decl., Ex. 21 [Doc. No. 111-21] ("Collectively and in combination, the materials, heat treatments, dimensional sizes, dimensional tolerance limits, radial clearance, lubricants, and surface finishes all come

---

[4] The parties dispute and it is not clear from the record whether the alleged trade secret contains 4 or 6 features. Compare Plaintiff's Supp. Resp. to Def.'s Interrogatory Nos. 1, 2 and 4 at 3, Ex. 22 [Doc. No. 111-22] (describing 6 features); with R. Adams Report, Ex. 24 ¶ 86 [Doc. No. 111-24] (describing 4 features). Whether the alleged trade secret has four or six features does not alter the court's analysis or its conclusion that Roller Bearing has demonstrated a genuine dispute of material fact as to whether the combination of features was a protectable trade secret.

together on the [] drawing to define a unique rod end product capable of operation during a mission critical event.").

Raytheon counters that Roller Bearing has not sufficiently identified its trade secret and that the description it provides is fatally vague. Def.'s Mem. 8-9 [Doc. No. 116]. It further argues that "it is undeniable that each [individual feature] was publicly known prior to disclosure to Raytheon or, in certain instances, originally requested by Raytheon itself, precluding [Roller Bearing] from claiming them as part of its own trade secret." Id. Raytheon contends that because all of the features were publicly known, they were never subject to the PIA and were thus properly included in the Vendor Item Control Drawings sent to other vendors. Id. at 15.

Raytheon argues further that "courts have long recognized that simply compiling publicly known features does not create a legally cognizable trade secret." Id. at 14. It also notes that, though no single publicly available disclosure contains the exact combination of features as the alleged trade secret, at least one catalog shows bearings of the same material utilizing the same type of lubricant. Id.; see New Hampshire Ball Bearing Catalog, Alquist Decl., Ex. 25 [Doc. No. 111-25]. Additionally, Raytheon argues that, even if the combination of features provided independent economic value from not being publicly known, the combination that Roller Bearing reached was readily ascertainable through proper means. Def.'s Mem. 15 [Doc. No. 116].

Roller Bearing effectively concedes[5] that each of the individual features is publicly known or available but asserts that its trade secret is in the particular combination of features

---

[5] Roller Bearing argues in its brief that the individual features of the bearing design were not commonly known, but then only references those features "in combination" with each other. See Pl.'s Opp'n 5-10 [Doc. No. 131]. Moreover, Roller Bearing admitted in its responses to Raytheon's Interrogatories that the features "in isolation" were publicly known in 2014. Id. at n.3.

16

assembled for the rod end bearing at issue. Pl.'s Opp'n 5 n.3 [Doc. No. 131] ("[T]he use of specific, individual features in rod ends may have been known prior to 2014, but the combination of these individual features for this particular type of bearing design for this specific application was not previously known.").[6]

Roller Bearing offers testimony from Robert Adams, Ph.D., that the rod end bearing design was not obvious or readily ascertainable from any publicly available information. Decl. of Robert Adams, PhD, in Opp'n to Raytheon's Mot. for Summ. J. ("Adams Decl.") ¶¶ 36-7 [Doc. No. 129]. Adams stated that McNeil's expertise and industry experience, in addition to significant time and resources expended by Roller Bearing, allowed him to make various non-obvious design choices that "would have been very difficult, if not impossible for people experienced in bearing design" to equivalently duplicate. Id. at ¶¶ 27-8. He noted that "even if there are only 4-6 options within [each individual feature's] categor[y] . . . the result is thousands of possible design permutations. Id. at ¶ 28.

Raytheon's expert disagrees. In his declaration, Michael Gordon, an aerospace engineer, asserts that given the requirements of the SDB II project, the choices Roller Bearing made in the design of the rod end bearing were obvious. Decl. of Michael P. Gordon in Supp. of Raytheon Company's Mot. for Summ. J. ("Gordon Decl.") ¶ 8 [Doc. No. 112-2].

For example, Gordon describes that although a standard rod end bearing typically consists of three pieces—a ball, an inner housing ring, and an outer ring—the industry standard

---

[6]Although courts have held that "the patentability of [a] concept . . . certainly weighs against a summary judgment finding that the design was readily ascertainable," Diomed, Inc. v. Vascular Sols., Inc., 417 F. Supp. 2d 137, 144 (D. Mass. 2006), Roller Bearing does not attempt to show that the patent is identical to its alleged trade secret, so the court cannot evaluate its argument that the patent is evidence that it meets the "unique and nonobvious" standard required by trade secrets law.

three-piece design has load ratings below what was required by Raytheon's Initial Vendor Item Control Drawing, so "using a two-piece loader slot bearing that . . . provides an increased thickness of the housing in critical areas for higher load ratings was obvious." Id. at ¶¶ 6, 8. "[W]hen faced with the particular problem Raytheon faced, such as high load ratings, an engineer was limited to a finite number of obvious design specifications to meet Raytheon's needs." Id. at ¶ 15. Gordon avers that he was able to design the rod end bearing that Roller Bearing claims was protected based on Raytheon's requirements and publicly available information. Id. at ¶ 16.

Courts generally hold that obvious combinations of publicly known features do not create legally cognizable trade secrets. See Gillette Co. v. Provost, 2017 WL 2292748, at *3, (Mass. Super. Apr. 19, 2017); Sutra, Inc. v. Iceland Express, 2008 WL 2705580, at *4 (D. Mass. July 10, 2008); Iconics, Inc., 266 F. Supp. at 454; Julie Research Labs., Inc. v. Select Photographic Eng'g, Inc., 998 F.2d 65, 67 (2d Cir. 1993); Strategic Directions Group, Inc. v. Bristol-Myers Squibb Co., 293 F.3d 1062, 1065 (8th Cir. 2002).

The question, then, is whether Roller Bearing has demonstrated a genuine issue of material fact regarding the obviousness of the combination of the individual features of the rod end bearing design such that summary judgment is precluded. See Covidien LP v. Esch, 378 F. Supp. 3d 119, 126 (D. Mass. 2019) ("the finding of whether the combination [of] features was 'obvious' is [a] material fact in in dispute" so "defendant is not entitled to summary judgment"). Given the parties' competing expert testimony on the issue and that Raytheon has been unable to point to an identical combination of features in any bearing catalog, the court concludes Roller Bearing has. Viewing the evidence in the light most favorable to Roller Bearing, a reasonable

jury could conclude that Roller Bearing's rod end bearing design was not obvious. Raytheon is therefore not entitled to summary judgment on this ground.

        b.      Reasonable Measures to Secure Information

Raytheon next argues that, even if Roller Bearing's design constitutes a protectable trade secret, Roller Bearing did not take reasonable measures to protect it. As a general matter, a party seeking to prevail on a claim for misappropriation of trade secrets must establish that it took reasonable steps to secure the secrecy of its alleged trade secret. See Incase Inc. v. Timex Corp., 488 F.3d 46, 52 (1st Cir. 2007). These measures can include marking documents as "confidential or secret" and making use of confidentiality agreements, like NDAs. Id.

Raytheon argues that Roller Bearing failed to take measures to protect its alleged trade secret despite knowing that the Final Vendor Item Control Drawing would be sent to other vendors. Def.'s Mem. 13 [Doc. No. 116]. Raytheon asserts that, if Roller Bearing had concerns about the protection of information included in the drawing, it had a responsibility to complain that the drawing was improperly marked as Raytheon Proprietary or to tell Raytheon that it believed the drawing contained Roller Bearing's trade secret. Id.

Roller Bearing repeats its claim that Raytheon's use of Vendor Item Control Drawings did not vitiate the protections of the PIA, which Roller Bearing contends extended to the information in the drawings. Pl's. Opp'n 17 [Doc. No. 131]. Moreover, Roller Bearing details the measures it took to protect its information in addition to the PIA, evidenced by Roller Bearing's NDAs with all of Raytheon's wing assembly suppliers that would be privy to the rod end design, Roller Bearing's annotations of drawings sent to Raytheon with Roller Bearing's confidential and proprietary markings, and its inclusion of confidentiality warnings on all emails it exchanged with Raytheon related to the rod end bearing project. Id. at 17-18.

As the First Circuit has recently reiterated, "[t]o determine whether a company took reasonable steps to protect its trade secrets, courts have considered '1) the existence or absence of [a confidentiality agreement], 2) the nature and extent of precautions taken, 3) the circumstances under which the information was disclosed and 4) the degree to which the information has been placed in the public domain or rendered readily ascertainable.'" Allstate, 79 F.4th at 192 (quoting TouchPoint Sols., Inc. v. Eastman Kodak Co., 345 F. Supp. 2d 23, 29 (D. Mass. 2004)). The Allstate panel went on to conclude that where "[n]o one dispute[d] the presence of confidentiality provisions" in the relevant agreements, the plaintiff specified and communicated clearly which information was confidential and how it was to be handled and took multiple precautions to protect the information by only granting access to certain persons, using passwords, and revoking the access of former employees, and the information was not in the public domain or readily ascertainable, the district court was correct to conclude the record indicated the plaintiff took sufficient steps to protect its information. Id. at 192-3. The First Circuit specifically rejected the defendant's contention that plaintiff could have done more to protect its information because "the standard is reasonableness, not perfection," TouchPoint, 345 F. Supp. 2d at 30, and a party need not take "heroic measures" to preserve the confidentiality of its trade secrets," USM Corp. v. Marson Fastener Corp., 379 Mass. 90, 101 (1979); Allstate, 79 F.4th at 193. Here, a jury could find that Roller Bearing's similar measures sufficiently protected its information for purposes of trade secrets law.

Raytheon argues further that Roller Bearing failed to comply with the terms of the PIA by not objecting to the drawings that did not include Roller Bearing's proprietary legend. But Roller Bearing did mark the Roller Bearing Marked Vendor Item Control Drawing, Alquist Decl., Ex. 8 [Doc. No. 111-8], which is the one drawing that it disclosed. Moreover, even if the

PIA could be read to impose an obligation to mark Raytheon's disclosures, this does not require a finding that Raytheon did not take reasonable measures to protect its trade secrets. "[E]ven with a written [confidentiality agreement] in place, the Court may examine the conduct of the parties to determine the scope of their confidential relationship and the reasonableness of their efforts to protect secrecy." TouchPoint, 345 F. Supp. 2d at 30. In TouchPoint, the defendant contended that plaintiff's failure to label its information as confidential as required by its non-disclosure agreement meant that plaintiff had failed to take reasonable steps to preserve secrecy. Id. at 29. Rejecting that argument, the court found that "[u]nquestionably, the better practice would have been for [plaintiff] to remain utterly faithful to the written protection provision," but "[e]ven though [plaintiff] did not faithfully comply with the [N]DA when it disclosed information to [Defendant], the [N]DA's existence is some evidence of reasonable security measures." Id. at 30.

There is evidence in the record that Roller Bearing had various measures in place to protect its information, including confidentiality and trade secrets training for employees, confidentiality markings on emails, the confidentiality marker on the Roller Bearing Marked Vendor Item Control Drawing, and the PIA. Viewing this evidence in the light most favorable to Roller Bearing, the court finds that a reasonable jury could conclude that Roller Bearing undertook reasonable measures to protect its information. Accordingly, Raytheon is also not entitled to summary judgment on this ground.[7]

In sum, Roller Bearing has demonstrated that genuine issues of material fact exist as to both whether the rod end bearing design at issue constitutes a legally protectable trade secret and

---

[7] Raytheon does not move for summary judgment on the third prong of the misappropriation analysis, which asks whether the defendant obtained the alleged trade secret through improper means. Because neither party briefs the issue, the court does not reach it.

whether it took reasonable measures to protect its allegedly secret information. As such,

Raytheon's <u>Motion for Summary Judgment</u> [Doc. No. 114] is DENIED as to Counts II and III.[8]

B.   *Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing (Counts I and IV)*

1.   The PIA and the Parties' Competing Terms and Conditions

As a preliminary matter, the parties dispute which contract—the PIA or one of Roller

Bearing or Raytheon's standard terms and conditions—presently controls. Raytheon argues that,

regardless of the applicability of the PIA to the Final Vendor Item Control Drawing, the PIA was

superseded by Raytheon's standard terms and conditions, which Roller Bearing accepted when it

fulfilled Raytheon's 2015 Purchase Order. The 2015 Purchase Order states that agreement by a

seller to furnish the goods or services included in the Purchase Order "constitute[s] Seller's

unqualified acceptance" of the Purchase Order's terms" and "[a]ny terms or conditions proposed

by Seller inconsistent with or in addition to the terms and conditions herein contained shall be

void and of no effect unless specifically agreed to by [Raytheon] in writing." Raytheon Terms

and Conditions ¶ 1, Alquist Decl., Ex. 15 [Doc. No. 111-15]. Raytheon contends that  Roller

Bearing accepted Raytheon's terms by shipping the rod end bearings to Raytheon on May 18,

2015. Def's. Mem. 18 [Doc. No. 116].

Roller Bearing argues that various material facts are in dispute that preclude summary

judgment on this ground, including (1) whether the form terms and conditions referenced in

Raytheon's 2015 Purchase Order supersede the terms of the PIA; (2) whether the 2015 Purchase

Order and the form terms and conditions were intended by the parties to be a modification of or

---

[8] Because Raytheon is not entitled to summary judgment  on Counts II and III, the court also denies Raytheon summary judgment as to Count V, in which Roller Bearing seeks a declaratory judgment that the rod end bearing drawing is its trade secret and protectable under federal and state trade secrets law.

amendment to the PIA, especially in light of the PIA's non-modification clause; and (3) if the terms and conditions do supersede the PIA, whether Roller Bearing "accepted" the terms and conditions under M.G.L. c. 106, § 2-207. Roller Bearing also argues that Raytheon fails to account for the PIA at all, despite its inclusion of a non-modification clause.

In the alternative, Roller Bearing argues that even if Raytheon could demonstrate that no material facts are disputed as to whether the PIA was superseded or modified, there remain disputed material facts as to whether Roller Bearing's Quote and incorporated terms and conditions, which preceded Raytheon's Purchase Order, constituted an offer under Massachusetts law. Roller Bearing argues that in that case, its terms and conditions would control. Roller Bearing claims this is a "classic battle of the forms" under UCC 2-207. Pl.'s Opp'n 22 [Doc. No. 131] (quoting Softub, Inc. v. Mundial, Inc., 53 F. Supp. 3d 235, 249 (D. Mass. 2014)).

The PIA contains an express non-modification clause, which provides that it "may not be amended or modified except by subsequent agreement in writing executed by a duly authorized officer or representative of each party." PIA ¶ 14, Alquist Decl., Ex. 1 [Doc. No. 111-1]. Raytheon has not established that the form terms and conditions the parties exchanged as part of the purchase order process meet the requirements for modification set out by the PIA. Accordingly, as to the parties' obligations regarding proprietary information, the court finds that the terms of the PIA were not superseded by either party's form terms and conditions.

2.      Breach of Contract Under the PIA

Roller Bearing alleges that Raytheon breached the terms of the parties' Proprietary Information Agreement by forwarding the specifications for the rod end bearing design incorporating Roller Bearing's alleged trade secrets to Multicut without taking adequate steps to

identify or protect Roller Bearing's confidential information. See Complaint ¶ 86-90 [Doc. No. 1]. It alleges that Raytheon then failed to prevent the unlawful distribution of Roller Bearing's trade secrets to its subcontractors, asserted ownership over Roller Bearing's proprietary information that had been properly designated as such, and unlawfully authorized its subcontractor Multicut to source the rod end bearing from any source, so long as it met the drawing's requirements. Id. at ¶¶ 91-93. Roller Bearing alleges that this conduct also violated the implied covenant of good faith and fair dealing. Id. at ¶¶ 124-130.

Raytheon seeks summary judgment on Roller Bearing's breach of contract and related claims on the ground that Roller Bearing has not established that it possessed a valid trade secret in the rod end bearing design. Def.'s Mem. 7 [Doc. No. 116]. Raytheon maintains that the features of the Final Vendor Item Control Drawing were "information that is in the public domain," or were features proposed by Raytheon, and therefore not subject to the confidentiality provisions of the PIA. Id. at 12. Because the question of whether the features in the drawing were proprietary is a genuine dispute of material fact, summary judgment on Roller Bearing's breach of contract claim (Count IV) on this ground is unwarranted.

Raytheon also argues that Roller Bearing failed to object that the Final Vendor Control Drawing was marked with only Raytheon's proprietary markings and not Roller Bearing's proprietary markings and so cannot establish that Raytheon improperly disclosed any of Roller Bearing's "Proprietary Information" as defined in the PIA. Id. at 13. Roller Bearing counters that McNeil specifically marked his drawings to Raytheon "to demonstrate the design was being produced pursuant to the PIA and that his proposal was to be kept confidential and proprietary[.]" Pl.'s Opp'n 4 [Doc. No. 131]. Further, Roller Bearing argues that Raytheon's marking of drawings as "Vendor Item Control Drawings" did not absolve Raytheon of its

obligations under the PIA. Id. at 13. Roller Bearing contends that nothing in the ASME Standard definition of "Vendor Item Control Drawing" precludes the inclusion of a vendor's confidential or proprietary information, and that that information remained subject to the confidentiality requirements of the PIA. Id. at 13-14. Roller Bearing argues that no one at Roller Bearing understood that the "vendor item control" marking meant that Raytheon was free to use the drawing "in a completely unrestricted manner with other competitors[.]" Id. at 14-15. To the contrary, Roller Bearing claims that it understood Raytheon's markings of its drawings as "Raytheon Proprietary" and Raytheon copyright as evidence that it was complying with the provisions of the PIA. Id. at 16.

A jury could find that Roller Bearing complied with its obligations under the PIA in marking the document it disclosed, see Roller Bearing Marked Vendor Item Control Drawing, Alquist Decl., Ex. 8 [Doc. No. 111-8], and was not required to demand that Raytheon mark its disclosures with Roller Bearing's markings where Raytheon had a contractual obligation, as the recipient of such information, to protect Roller Bearing's information as it would protect its own, see PIA ¶ 6(a), Alquist Decl., Ex. 1 [Doc. No. 111-1]. Moreover, despite the use of a Vendor Item Control Drawing for procuring items from vendors, Raytheon itself had initially underscored the confidentiality of the information by including on the Vendor Item Control Drawing its paragraph-long statement restricting use "ONLY BY PERSONS AUTHORIZED BY RAYTHEON IN WRITING TO USE IT" and prohibiting further disclosure without written approval. Final Vendor Item Control Drawing." Alquist Decl., Ex. 11 [Doc. No. 111-11].

For these reasons, Raytheon is not entitled to summary judgment on Roller Bearing's breach of contract claim (Count IV).

## IV.    Conclusion

For the foregoing reasons, Defendant's <u>Motion for Summary Judgment</u> [Doc. No. 114] is

DENIED as to all counts.

IT IS SO ORDERED

November 3, 2023                                    /s/ Indira Talwani
                                                   United States District Judge