**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| ROLLER BEARING COMPANY OF AMERICA, INC., <br><br> Plaintiff, <br><br> v. <br><br> RAYTHEON COMPANY, <br><br> Defendant. | Civil Action No. 1:20-cv-10889-IT <br><br><br> August 16, 2024 |

## PLAINTIFF RBC'S TRIAL BRIEF

Pursuant to this Court's Amended Procedural Order re: Pretrial/Trial, dated February 20, 2024 (Doc No. 185) and subsequent orders, Plaintiff, Roller Bearing Company of America, Inc. ("RBC"), hereby files this trial brief.

## RBC'S CLAIMS

RBC has four claims for trial: (1) breach of contract, (2) trade secret misappropriation under the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, and under M.G.L. c. 93 §§ 42 *et. seq.*, (3) breach of the covenant of good faith and fair dealing; and (4) declaratory judgment under 28 U.S.C. § 2201.

## RBC'S EVIDENCE IN SUPPORT OF EACH CLAIM ON THE MERITS

### I.   Breach of Contract

It is undisputed that Raytheon and RBC entered into a valid and enforceable non-disclosure agreement, known as the Proprietary Information Agreement ("PIA"), in September 2014, in connection with Raytheon's Small Diameter Bomb II ("SDB II") Program.  *See* Trial Exhibit 65. Raytheon admitted as much in its Answer to the Amended Complaint.  *See* Doc No. 25 ¶ 87.  As such, to succeed on its breach of contract claim at trial, RBC needs to prove that: (1) RBC

performed its material obligations under the PIA; (2) Raytheon breached one or more terms of the PIA; and (3) RBC suffered damages as a result of Raytheon's breach of the PIA.

### i.    RBC Performed its Material Obligations

RBC will establish that under ¶ 2(a) of the PIA, it had a material obligation to identify and appropriately mark any proprietary information it disclosed to Raytheon.  The PIA specifies that information is considered appropriately marked if it states: "'Proprietary' in combination with the Discloser's name."  Trial Exhibit 65 ¶ 2(a)(i).  There is no question RBC fully complied with ¶ 2(a) when it disclosed its proprietary rod end bearing design to Raytheon in the Bubble Drawing (Trial Exhibit 6).  Specifically, RBC's aerospace applications engineer, Scott McNeil, handwrote in capital letters: "ALTERNATIVE PROPOSAL MARKED UP BY: SCOTT McNEIL P.E. RBC BEARINGS AEROSPACE TECH. DEVELOPMENT MGR FURNISHED TO RAYTHEON UNDER RBC BEARINGS – RAYTHEON NDA CONFIDENTIAL & **PROPRIETARY MATERIAL OF RBC BEARINGS**."  Trial Exhibit 6 (emphasis added).

The rod end design RBC provided on the Bubble Drawing was a "custom" design that RBC created—at Raytheon's request—by a specialized engineer with 30+ years of experience in the industry and delivered within the aggressive lead time Raytheon required.  *See* Trial Exhibit 20 (Raytheon acknowledges it would need a "custom" rod end); Trial Exhibit 87 (discussing Raytheon's short lead time requirement); Trial Exhibit 85 (discussing Raytheon need for rod ends ASAP and the "magic" that would be required of RBC to make it happen).  RBC assigned the subject rod end bearing the part numbers: MSSTM03R (right threaded) and MSSTML03R (left threaded), with the "R" standing for Raytheon.  The evidence will show that at the time RBC disclosed its custom rod end bearing design to Raytheon in the Bubble Drawing, the combination of the six features of the design was not in the public domain, nor had it been disclosed to others

without restriction. *See* Trial Exhibit 65 ¶ 4. Thus, the design constituted "Proprietary Information" under the PIA. Upon receiving the Bubble Drawing, Raytheon did not send it to its legal department to verify whether the design was indeed proprietary (*i.e.*, not in the public domain). Likewise, Raytheon did not challenge RBC's unequivocal assertion that the design is proprietary to RBC. Instead, the Raytheon employee who received the Bubble Drawing, Chris Remy, ignored the proprietary markings, did not check the terms of the PIA, and unilaterally determined to treat it as if there was nothing proprietary to RBC on the drawing.

The PIA is clear: "**[a]ll Proprietary Information furnished hereunder shall remain the property of the Discloser** …." Trial Exhibit 65 ¶ 8 (emphasis added). Further, no proprietary right is granted or conveyed by a party who discloses Proprietary Information under the agreement. *See* Trial Exhibit 65 ¶ 9. Accordingly, RBC's Proprietary Information could not lose its protected status, or become Raytheon's property after disclosure to Raytheon. Also, the PIA does not impose any continuing obligation on the discloser of Proprietary Information to remind the recipient of the protected status of the information. Indeed, any such requirement to police Proprietary Information disclosed under the PIA would defeat much of the utility of the agreement.

### ii.   Raytheon Breached Multiple Terms of the PIA Multiple Times

The PIA provides that the recipient of Proprietary Information (*i.e.*, Raytheon) must "hold it in confidence from the date of receipt…." Trial Exhibit 65 ¶ 3(a). The PIA also provides that Raytheon "shall … use the same reasonable degree of care which [Raytheon] uses to protect its own information of similar character…." Trial Exhibit 65 ¶ 6(a). As such, when Raytheon put "Raytheon Proprietary" on a drawing containing RBC's trade secret rod end design (Trial Exhibit 8), this marking was consistent with its obligation to protect RBC's information as if it was its own.

The PIA requires Raytheon to use Proprietary Information "only for the purposes specified above in the recitals … and/or for such other purposes as may be subsequently authorized in writing by Discloser."  Trial Exhibit 65 ¶ 3(a).  Here, there was never any subsequent written authorization from RBC concerning the rod end bearing design—as such, the express purposes in the PIA govern the relationship.  The third WHEREAS clause of the PIA specifies RBC's purposes for disclosing Proprietary Information, which includes allowing Raytheon to use the information only in connection with the SDB II program.  There are, however, conditions to Raytheon's use of RBC's Proprietary Information.  Namely, it can only be used (i) to the extent expressly permitted by RBC in writing; (ii) in connection with and **for purposes of a business relationship with RBC**, or (iii) for purposes of submitting bids or proposals **to RBC for supply of goods or services**…."  Trial Exhibit 65, p. 1 (emphasis added).  The evidence will show that Raytheon's use of RBC's Proprietary Information ran far afoul of these conditions.

The PIA permits Raytheon to disclose RBC's Proprietary Information to third parties, but only under specific, limited circumstances, and only for the specified purposes set forth above. *See* Trial Exhibit 65 ¶ 6(b).  Relevant here, Raytheon was permitted to disclose RBC's Proprietary Information "to vendors and subcontractors to the extent required in connection with **the purpose specified above provided that** such vendors and subcontractors have undertaken **written obligations to protect [RBC's] Proprietary Information** in a manner at least as protective as the provisions of this Agreement or in such other form approved in writing by [RBC]."  Trial Exhibit 65 ¶ 6(b)(iii) (emphasis added).  Nothing in the PIA permitted Raytheon to disclose RBC's Proprietary Information to the detriment of RBC.

The evidence at trial will establish that Raytheon breached the PIA in several ways, on multiple occasions.

First, in or around May 2016, Raytheon sent Multicut a drawing containing RBC's proprietary rod end bearing design. However, in May 2016, Raytheon did not have an NDA in place with Multicut for the SDB II. *See* Trial Exhibit 113 (PIA between Raytheon and Multicut related to the SDB II program, dated July 15, 2016). By disclosing RBC's trade secret design to Multicut without having an NDA for the SDB II program in place with Multicut, Raytheon breached PIA ¶ 6(a). That is, Raytheon failed to use the same reasonable degree of care which it would use to protect its own proprietary information.

Second, when Raytheon provided Multicut with the drawing, Raytheon did not tell Multicut at this point, or at any other point in time, that the design was proprietary to RBC or that RBC claimed the design was its Proprietary Information. Multicut also had not yet entered into an NDA with RBC—the NDA was not executed until February 13, 2017. *See* Trial Exhibit 117. This too constitutes a violation of PIA ¶ 6(b)(iii) because Multicut was under no written obligation **to anyone** to protect RBC's Proprietary Information at the time it received the drawing. Indeed, due to Raytheon's misconduct, Multicut apparently was not even aware it was in possession of RBC's Proprietary Information. Thus, Raytheon essentially represented to Multicut that Raytheon had authority to waive protections regarding the rod end bearing design.

Third, Raytheon again breached the PIA in or around May of 2017 when, as a part of Raytheon's cost-cutting campaign for the SDB II—it knew of, encouraged, and approved of Multicut shopping a drawing containing RBC's proprietary rod end bearing design around to RBC's competitors. *See* Trial Exhibits 270 and 272 (Raytheon instructs Multicut to reduce the cost of SDB II parts and schedules a meeting for April 26-27, 2017 regarding the same); Trial Exhibits 1, 46, 49, and 292 (indicating Raytheon had knowledge that Multicut was going to, and did, shop around RBC's proprietary rod end design); Trial Exhibits 103-108 and 283 (Multicut

shops RBC's proprietary rod end design around to RBC's competitors).  Raytheon's actions, in encouraging and permitting disclosure of RBC's Proprietary Information to vendors/subcontractors competing with RBC violated PIA ¶ 6(b)(iii) because such disclosure was done in direct contravention of the purposes set forth in the third WHEREAS clause of the PIA. That is, the disclosures were not expressly authorized by RBC in writing, they were not for purposes of a business relationship with RBC, and they were not for proposals to RBC for the sale of the rod end bearings.  Instead, the disclosures were for the purpose of reducing Raytheon's costs for the SDB II by sourcing the rod end bearings from one of RBC's competitors, who could charge a lower price because it did not have engineering resources and had not invested any money in engineering the design.

Fourth, as it turns out, Multicut also was disclosing the drawing that included RBC's Proprietary Information without obtaining any NDAs from these vendors/subcontractors, which constitutes a violation of PIA ¶ 6(b)(iii) because Raytheon failed to ensure that its vendors/subcontractors were taking adequate steps to protect RBC's Proprietary Information with "the same reasonable degree of care which [Raytheon] uses to protect its own information of similar character." Trial Exhibit 65 ¶ 6(a).  Compounding this breach, once Raytheon learned that Multicut never obtained NDAs from these other vendors/subcontractors, it appears Raytheon took no action to address or mitigate the damage that had been done as a result of Multicut's improper disclosure of RBC's Proprietary Information.

Fifth, in July 2017, after RBC sent an email to Multicut informing Multicut that it may have misappropriated RBC's Proprietary Information by circulating the drawing to other

vendors/subcontracts, Multicut forwarded the email to Raytheon[1] and, as Frank Duhring's testimony will demonstrate, he asked Raytheon for advice on how to proceed. Rather than immediately instructing Multicut to cease circulating the drawing containing RBC's Proprietary Information, Raytheon falsely assured Multicut that RBC's claims lacked merit, asserting that RBC had no trade secrets or proprietary information in the drawing of the rod end bearing, and that the design was proprietary to Raytheon. Simultaneously, Raytheon internally determined to take the position that RBC had no proprietary claim to the rod end bearing design. These actions constitute a violation of PIA ¶¶ 8 and 9 since Raytheon asserted ownership over RBC's Proprietary Information.

Sixth, in October 2018, after RBC initiated a lawsuit against Multicut for, *inter alia*, breach of contract and trade secret misappropriation, Multicut sought written confirmation from Raytheon that it is "the rightful owner of the design of the part on the drawing" for the subject rod end bearing. Trial Exhibit 1. In response, after its investigation, Raytheon again asserted ownership over the design. *See* Trial Exhibit 1. Later that same day, Raytheon doubled down on its position that it is the owner of the design and sent Multicut a presentation on the topic. *See* Trial Exhibits 1, 236, and 241. This assertion of ownership over RBC's Proprietary Information likewise constitutes a violation of PIA ¶¶ 8 and 9.

### iii.   Raytheon's Breaches of the PIA Caused RBC to Suffer Damages

As a result of Raytheon's breaches of the PIA, RBC was deprived of sales of its proprietary rod end bearing. In 2017, RBC and Multicut were negotiating a long-term agreement ("LTA") whereby RBC would be the source of the rod ends necessary for the SDB II through at least April

---

[1] *See* Trial Exhibit 48 (Duhring forwards RBC's email and says to Raytheon's Steve Bliss: "Call me").

2023.[2]  *See* Trial Exhibit 123.  At that time, Raytheon urgently needed the rod end bearing that RBC designed to meet its deadlines for its contract with the U.S. Department of Defense.  *See* Trial Exhibits 44 and 7 (Raytheon discussing "aggressive delivery date" for the wing assemblies and that it has "very little margin in our production schedule" and "cannot afford to wait" a couple of weeks to resolve rod end bearing supply issue).  Raytheon specifically needed the rod end bearing that RBC designed—not an alternative design—because RBC's rod end bearing had been successfully used in the SDB II for qualification testing.  Replacing the bearing at that point in time would have required requalifying testing at substantial cost and would have jeopardized Raytheon's timely delivery to the United States under its government contract.  *See* Trial Exhibit 47 (Multicut recommends, in June 2017, continuing to negotiate with RBC, noting "Raytheon design is developed with RBC HEIM" and "Raytheon Test is performed with RBC HEIM parts."); Trial Exhibit 58 (Raytheon acknowledging, in August 2017, its "reliance" on the RBC rod end design).  Given the time constraints Raytheon was under to timely deliver on its government contract, testing and qualifying a new rod end bearing for use in the SDB II was not a viable option.  And, RBC had the parts in stock and could deliver in time to meet the SDB II program needs.  *See* Trial Exhibit 47.

Instead of encouraging Multicut to enter into an LTA with RBC, Raytheon—to save money—inserted itself into their negotiations, applying substantial pressure **on RBC** to lower its prices and cooperate with Multicut to avoid jeopardizing the SDB II Program.  *See e.g.*, Trial Exhibit 54 (August 8, 2017 internal Raytheon message stating: "At noon I'm going to call RBC to try and encourage them to accept Frank's PO while they discuss the LTA.  Let them know they

---

[2] RBC already had in place an LTA with Raytheon's prior wing housing assembly vendor, Klune Industries, providing exclusivity to RBC for the rod end bearings.

are a top risk for the program right now.  I'm going to play nice at this point and try to get the hardware[.]  If they won't play nice I'm going to ask if they'll sell us 500 sets.").  While the negotiations between Multicut and RBC appeared to be ongoing, with Raytheon's full knowledge and approval, Multicut was already qualifying another vendor to supply the rod end bearings for the SDB II Program—using RBC's misappropriated Proprietary Information—to replace RBC as the supplier going forward.

If Raytheon and Multicut did not freely give RBC's proprietary rod end bearing design to RBC's competitors, no other company would have been able to design or manufacture these parts and take over as the supplier for the long-term needs of the SDB II Program.  In other words, knowledge of the design is necessary to manufacture the rod end bearings that Raytheon needed, and that design was not in the public domain.  Thus, if Raytheon had kept RBC's proprietary rod end bearing design confidential, as it was required to do under the PIA, RBC would have supplied the rod end bearings for the SDB II from 2017 through at least April 2023.  Indeed, the company that was awarded the rod end business in place of RBC (*i.e.*, Eltronics) has been the sole supplier of rod end bearings for the SDB II through the end of 2023.  *See* Trial Exhibits 333, 334, and 335.

## II.   **Raytheon's Trade Secret Misappropriation Under The Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 and Under M.G.L. c. 93 §§ 42 *et. seq.***

The requirements to prove trade secret misappropriation under the DTSA are substantially similar to those under Massachusetts law.  *See Viken Detection Corp. v. Videray Techs. Inc.*, 384 F. Supp. 3d 168, 177 (D. Mass. 2019).  As such, to succeed on its trade secret misappropriation claims at trial, RBC must prove: (1) RBC's rod end bearing design was a trade secret; (2) RBC took reasonable steps to preserve the secrecy of its rod end bearing design; and (3) Raytheon disclosed or used RBC's rod end bearing design in a way that breached its duty of confidentiality to RBC.

### i.      Existence of Trade Secret

A "trade secret" is information that provides an "**economic advantage**, actual or potential, **from not being generally known to**, and not being readily ascertainable by proper means by, others who might obtain economic advantage from its acquisition, disclosure or use." M.G.L. 93 § 42(4)(i) (emphasis added).  It is well settled that detailed manufacturing drawings are prima facie trade secrets.  *See DB Riley v. AB Eng'g Corp.*, 977 F. Supp. 84, 90 (D. Mass. 1997), citing *USM Corp. v. Marson Fastner Corp.*, 379 Mass. 90, 100 (1979).   As set forth below, there is an abundance of evidence that RBC's rod end bearing design afforded an economic advantage to RBC and was not generally known.

In addition, a number of factors relevant to the existence of a trade secret establish that RBC's rod end bearing design is a trade secret.  Namely, at the time it was disclosed to Raytheon: (1) it was not known outside of RBC, (2) RBC took reasonable measures to guard the secrecy of the design,[3] (3) the design was of considerable value to RBC, Raytheon, and RBC's competitors, (4) a substantial amount of expertise, effort, and money were expended by RBC in developing the rod end design, and (5) it would have been incredibly difficult—if not impossible—for the design to be properly acquired or duplicated by others with publicly available information, particularly in the time frame required.  Tellingly, both Raytheon and Multicut have admitted during depositions to lacking the capacity to design or manufacture rod ends on their own.

In 2014, the SDB II failed a corrosive environment test that was required under Raytheon's contract with the United States government.  *See* Trial Exhibit 15 ("Corrosive Atmosphere Qualification Failure" presentation).  The wings of the bomb failed to deploy.  *See* Trial Exhibit

---

[3] This factor of the analysis is discussed in greater detail in Part II (iii) of this brief.

15, RTN0000725.  This presented a time-sensitive, multi-million-dollar problem for Raytheon.  It had to go back to the drawing board, and expeditiously fix the issues with the SDB II in order to timely deliver on its lucrative contract with the U.S. Department of Defense.  If Raytheon missed a deadline in its contract with the U.S. government, there would be adverse consequences, including jeopardizing Raytheon's potential to be awarded future contracts as well as having to provide additional consideration on the current contract without compensation.

One of the things Raytheon needed to change after the failed corrosive environment test was the rod end bearings in the wing assemblies for the SDB II.  Raytheon approached RBC to solve this problem.  *See* Trial Exhibit 18.  Raytheon testified it had been using what it described as an "arts and crafts"[4] rod end that Raytheon would have to purchase and then modify, with costly additional machining.  Because the machining was expensive, Raytheon sought a simpler solution. Additionally, the rod end was susceptible to the same type of corrosion as those parts that clearly failed the corrosive environment test.  Originally, Raytheon was hoping for an off the shelf solution—meaning a rod end bearing that could be found in a catalog.  *See* Trial Exhibit 18.  It learned through conversations with RBC and other bearing distributors, however, that it would need a custom rod end bearing if an off the shelf solution was not possible.  *See* Trial Exhibit 18. Before long, it became clear to Raytheon that a custom rod end bearing was required, and RBC offered to create a design specifically for the SDB II application.  *See* Trial Exhibits 20 and 253.

On April 1, 2015, with the PIA already in place, Raytheon sent RBC a drawing of the rod end bearing it thought it needed for the SDB II ("Original Drawing").  *See* Trial Exhibit 22 (email containing the Original Drawing); Trial Exhibit 78 (drawing itself); Trial Exhibit 65 (the PIA).  As RBC's aerospace applications engineer, Scott McNeil, analyzed the Original Drawing it became

---

[4] *See* Trial Exhibit 253, RTN0002404.

clear to him that the design in the drawing would not work in the intended SDB II application.  *See* Trial Exhibit 97, RBC01389.  McNeil therefore set out to create an improved rod end bearing that would meet Raytheon's requirements.  In so doing, McNeil—who had been designing bearings for over 30 years and had numerous bearing patents in his name—considered components RBC already had in stock, or could quickly obtain, to combine into a sturdier, more resilient and reliable rod end for the wing deployment mechanism in the SDB II.  McNeil's knowledge and expertise designing rod ends for the aerospace industry allowed RBC to expeditiously manufacture better rod ends for Raytheon.  His expertise allowed him to combine components that RBC could acquire quickly, even though they had never before been combined in this particular way.  The design was so unique and nonobvious that the fundamental concept of his design was granted two U.S. Patents by the U.S. Patent Office.  Critically, RBC was able to cut the lead time from 26 weeks to 4 weeks as a result of McNeil's knowledge and experience.

In creating his custom design, McNeil also utilized his proprietary Excel program that he created using eight years' worth of his prior work in the industry.  *See* Exhibit 185.  This Excel program allowed McNeil to leverage his experience and expertise—and avoid substantial trial and error testing that he otherwise would have had to do—to calculate the ideal dimensions for the rod end bearing and determine whether it would meet Raytheon's required load rating.  Again, the use of this program cut the time substantially in verifying the rod end bearing's suitability for the application in the SDB II.  No one else in the industry has as much bearing experience or expertise as McNeil.

On April 7, 2015, RBC sent Raytheon the Bubble Drawing containing the trade secret rod end bearing design conceived and developed by McNeil.  *See* Trial Exhibit 81 (email containing Bubble Drawing); Trial Exhibit 6 (Bubble Drawing itself).  Thereafter, RBC rigorously tested its

trade secret design, attempting to confirm that it would work as McNeil had hoped.  *See* Trial Exhibits 97-99 (discussing testing).  RBC's trade secret design was incorporated into the final drawing ("Final Drawing") of the part utilized in the SDB II, which Raytheon ultimately disclosed to third parties in violation of the PIA and used in ways that constitute trade secret misappropriation.  *See* Trial Exhibit 8.

The day after Raytheon received the Bubble Drawing from RBC (*i.e.,* April 8, 2015), the parties had a call during which Raytheon expressed that it needed at least 12 samples of each rod end designed by RBC as soon as possible.  *See* Trial Exhibit 84 ("A quick update on the Small Diameter Bomb program overall.  Raytheon indicated that this program has been accelerated by the Air Force and they want to ramp up production as quickly as possible.…  The near term challenge is that Raytheon needs at least 12 samples of each rod end to test their design. **I asked the need date and they said yesterday**.  The plan is to implement this design change in to [sic] the bomb by October.") (emphasis added).  RBC went to great lengths and expense to accommodate Raytheon's urgent need, including shutting down other operations at one of its factories to prioritize the production of the sample rod end bearings within a four-week window. *See* Trial Exhibit 85, RBC01114.  RBC was willing to do this because the expectation was that Raytheon would require tens of thousands of these rod end bearings in the future to support the SDB II Program, and it would put RBC in a position to secure a long-term agreement and realize the profits from the sales on a large quantity of units.  *See* Trial Exhibit 84 ("The length of the program demand is 22,000 of each rod end.").

On April 24, 2015, RBC issued a quote to sell Raytheon the sample rod end bearings within the extraordinarily short lead time of four weeks.  *See* Trial Exhibit 213.  The samples were timely shipped and delivered.  *See* Trial Exhibit 31, RTN00000425-26.

Raytheon was immensely grateful to RBC for providing a workable solution to its time-sensitive problem.  *See* Trial Exhibit 29 and 31, RTN0000425.  Raytheon paid $130 per unit for the sample rod end bearings without complaint.  *See* Trial Exhibit 213.  RBC was willing to supply the sample rod ends bearings at this price—despite that it did not come close to covering the actual expense of designing and producing the rod ends on such an expedited basis—because the expectation was that Raytheon would require many more of these rod ends in the future, and that RBC would be the only company that could provide the rod ends for the SDB II using this specific, proprietary design.  In other words, RBC expected that for another company to take the business from RBC it would need to independently design its own rod end bearing—without the benefit of seeing RBC's proprietary design—on the same expedited timeline.  Only RBC's design has been used in the SDB II since the design was first created by McNeil and RBC, which is indicative of the difficulty of replicating the design by proper means.  RBC's rod end design has allowed Raytheon to unlock over $800 million in revenue from the U.S. Department of Defense delivery orders for the SDB II program.  *See* Dkt. No. 209-2, p. 8 of 43.

These facts and circumstances demonstrate that RBC's rod end bearing design is a trade secret and provided an economic advantage to RBC.

ii.      **RBC's Reasonable Steps to Preserve the Secrecy of its Rod End Design**

The owner of a trade secret must take reasonable steps to preserve its secrecy.  The law requires only reasonable precautions, not heroic measures.  There are a number of factors that weigh in favor of a finding that RBC's precautions meet the reasonableness standard.  *See* Massachusetts Superior Court Civil Practice Jury Instructions (MCLE) § 15.4.4 (listing factors); *Optos, Inc. v. Topcon Ed. Sys.*, 777 F. Supp. 2d 217, 239-40 (D. Mass. 2011) (listing factors).

14

For instance, (1) RBC only disclosed its rod end bearing design to companies with which it had a nondisclosure agreement ("NDA"), including Raytheon (*i.e.*, the PIA), Klune (Raytheon's initial vendor producing the wing housing assemblies for the SDB II Program), and Multicut (who succeeded Klune);[5] (2) McNeil clearly and conspicuously marked the Bubble Drawing with a handwritten confidentiality warning, in accordance with and expressly referencing the PIA between RBC and Raytheon;[6] (3) RBC entered into an exclusive long-term supply agreement with Klune;[7] (4) emails from RBC to Raytheon containing information regarding the rod end design included a warning that the email contained confidential information;[8] (5) customer drawings ("CDs") containing the rod end design that RBC sent to Raytheon for approval featured a warning that the information in the drawing was confidential and proprietary to RBC;[9] (6) RBC's standard employment agreement contains provisions on the sensitivity of RBC's information and the importance of maintaining confidentiality;[10] (7) RBC trains its employees as to what constitutes confidential information and trade secrets and the various ways to protect confidential information, including requiring NDAs and long-term exclusive supply agreements; (8) RBC's standard Terms and Conditions of Sale, referenced in RBC's quote to Raytheon for the sample rod end bearings, expressly states that RBC retains all intellectual property rights related to its products, including trade secret protection;[11] (9) the rod end bearing transaction at issue was initiated by Raytheon—Raytheon came to RBC seeking a custom solution to a time-sensitive multi-million-dollar problem because it could not solve the problem on its own and another solution was not available off the

---

[5] *See* Trial Exhibits 65, 117, and 245.
[6] *See* Trial Exhibit 6.
[7] *See* Trial Exhibit 202 and 231.
[8] *See e.g.,* Trial Exhibit 247, RTN0000355-57.
[9] *See* Trial Exhibit 246.
[10] *See* Trial Exhibit 248.
[11] *See* Trial Exhibit 199.

shelf from anyone else;[12] and (10) the combination of the six features of RBC's trade secret rod end bearing was not in the public domain or readily ascertainable at the time it was disclosed to Raytheon.  These factors establish that RBC took more than adequate steps to maintain the secrecy of its proprietary rod end bearing design.

### iii.        Raytheon Misappropriated RBC's Trade Secret

To prevail on its claim for misappropriation, RBC must prove that Raytheon misappropriated its trade secret at least one time.  The evidence will establish Raytheon's misappropriation several times over by showing that Raytheon disclosed or used RBC's trade secret—without RBC's express or implied consent—and, at the time of Raytheon's disclosure or use it knew or had reason to know that its knowledge of the trade secret was acquired under circumstances giving rise to a duty to limit its disclosure or use.  In other words, if Raytheon knew, or had reason to know that it owed RBC a duty of confidentiality and, nevertheless, used or disclosed RBC's trade secret without authorization or consent, it misappropriated RBC's trade secret.  *See* M.G.L. c. 93 § 42(2)

A confidential relationship generally arises from the parties' conduct and the context in which they offer to disclose information to each other.  For instance, a duty of confidentiality arises when parties enter a contract agreeing to keep each other's proprietary information confidential.  Even if there is no contract, a duty will arise where the facts show that one party disclosed information to another party in order to promote a specific relationship.  For example, when a company discloses trade secret information to a potential purchaser to allow the purchaser to appraise the value of the secret, the purchaser will be bound by a duty to keep that information

---

[12] *See* Trial Exhibits 20 and 253.

confidential.  *See Diomed, Inc. v. Vascular Solutions, Inc.*, 417 F. Supp. 2d 137, 145 (D. Mass. 2006).

Here, it is undisputed that Raytheon owed RBC a duty of confidentiality—the parties entered into an express agreement (PIA) to keep each other's proprietary and trade secret information confidential.  RBC, through Scott McNeil, intentionally and clearly marked the Bubble Drawing with the requisite designations to inform Raytheon of RBC's claim of ownership in the rod end bearing design as RBC's Proprietary Information.  Additionally, RBC was disclosing information to Raytheon for the purpose of promoting its own supplier/purchaser business relationship with Raytheon.

Since 2015, Raytheon has engaged in a continuous course of misappropriation of RBC's trade secret rod end bearing design.  First, in April 2015, Raytheon's Chris Remy disregarded McNeil's markings on the Bubble Drawing and had RBC's rod end bearing design incorporated into Raytheon's Final Drawing of the rod end for the wing assembly of the SDB II.  Remy failed to take appropriate steps to treat RBC's proprietary rod end design as RBC's, essentially taking ownership of the design on behalf of Raytheon and treating it as Raytheon's own design for Raytheon's own use and benefit.

Second, in or around May 2016[13]—before Raytheon and Multicut entered into an NDA on July 15, 2016, and before Multicut and RBC had entered into an NDA on February 13, 2017 (Trial Exhibit 117)—Raytheon sent Multicut a drawing containing RBC's proprietary rod end bearing design.  While ¶ 6(b)(iii) of the PIA (Trial Exhibit 65) expressly says that Raytheon can disclose the information to its vendors and subcontractors, it can only disclose Proprietary Information

---

[13] *See Roller Bearing Co. of Am., Inc. v. Multicut N. Am., Inc.*, Case No. 3:18-cv-1212, Local Rule 56(a)1 Statement of Material Facts, Dkt. No. 125, ¶ 10 (D. Conn.).

(which necessarily includes trade secrets) to vendors and subcontractors **provided that** the vendors and subcontractors have undertaken **written obligations** to protect RBC's proprietary information.  At the time of Raytheon's disclosure, Multicut had not undertaken a written obligation to protect either Raytheon's or RBC's proprietary information.  *See* Trial Exhibit 113. In addition, Raytheon knew or had reason to know at the time of disclosure to Multicut, having entered into the PIA with RBC, that it was obligated to limit its disclosure of RBC's proprietary information.

Third, Raytheon again misappropriated RBC's trade secret in or around May of 2017 when, as a part of Raytheon's cost-cutting campaign for the SDB II—it encouraged and/or expressly approved of Multicut shopping around a drawing containing RBC's proprietary rod end bearing design to RBC's competitors.  *See* Trial Exhibits 270 and 272 (Raytheon instructs Multicut to reduce the cost of SDB II parts and schedules a meeting for April 26-27, 2017 regarding the same); Trial Exhibits 1, 46, 47, 49, and 292 (indicating Raytheon had knowledge that Multicut was going to, and did, shop around RBC's proprietary rod end design); Trial Exhibits 103-108 and 283 (Multicut shops RBC's proprietary rod end design around to RBC's competitors).  This constitutes misappropriation because Raytheon used RBC's trade secret to reduce its own costs for the SDB II, without RBC's consent, with full awareness that its knowledge of the trade secret was acquired under circumstances giving rise to a duty to limit its disclosure or use.

Fourth, as of at least July 2, 2017, Raytheon has been on notice that it is misappropriating RBC's trade secret rod end design.  *See* Trial Exhibit 48 (July 2, 2017 email from Multicut to Raytheon forwarding RBC email asserting that the rod end bearing design that Multicut and Raytheon have been competing [sending out for quote] is proprietary to RBC and constitutes misappropriation of intellectual property).  Notwithstanding this knowledge, Raytheon asserted

ownership over the design and has continued—to this day— to use RBC's trade secret rod end design without RBC's consent and with the knowledge that it acquired the design under circumstances giving rise to a duty to limit its use of the same, all for Raytheon's economic benefit.

Fifth, in October 2018, after RBC initiated a lawsuit against Multicut for, *inter alia*, breach of contract and trade secret misappropriation, Multicut sought written confirmation from Raytheon that it is "the rightful owner of the design of the part on the drawing" for the subject rod end bearing.  Trial Exhibit 1.  In response, Raytheon again asserted ownership over the design.  *See* Trial Exhibit 1.  Later that same day, Raytheon doubled down on its position that it is the owner of the design and sent Multicut a presentation on the topic.  *See* Trial Exhibits 1, 236, and 241. This assertion of ownership over RBC's trade secret rod end bearing design constitutes misappropriation because it is a use of RBC's trade secret design, without RBC's consent, at a time that Raytheon was aware that its knowledge of the design was acquired under circumstances giving rise to a duty to limit its use of the same.

### iv.        Damages for Misappropriation

RBC will establish that Raytheon's trade secret misappropriation caused RBC substantial damages.  Both RBC's and Raytheon's damages expert agree that lost profits is an appropriate measure for RBC's damages.  *See* Dkt. Entry No. 209-2, p. 9.  RBC is entitled to the profit it would have made but for the unlawful use of RBC's trade secret.  *See Jet Spray Cooler, Inc. v. Crampton*, 385 N.E.2d 1349, 1356 (Mass. 1979).   The evidence will show that but for Raytheon's misappropriation, RBC would have secured an LTA with Multicut in 2017 through at least April 2023, to supply Raytheon with the rod end bearings it required to timely deliver on its lucrative government contract for the SDB II.  This is because, in 2017, Raytheon urgently needed the rod end bearing that RBC designed to meet its deadline for its contract with the U.S. DOD.  *See e.g.*,

Trial Exhibit 284 (Raytheon saying in an email in May 2017 that it has an "aggressive delivery date" for the SDB II wings); Trial Exhibit 283, Multi-00041 (Multicut email to RBC competitor Eltronics sent with high importance in June 2017 saying: "The quote is very urgent…. First delivery is in July); Trial Exhibit 47 (June 2017 draft memo from Multicut to Raytheon informing that it sent out for quote RBC's rod end bearing design and "[t]he alternative prices are lower than RBC HEIM but we can unfortunately not use these parts due to missing qualification." Also, "the alternative supplier has 26 week delivery time, and that does not meet the SDB II program requirement for delivery.").  There was no time for Raytheon to have another company engineer an alternative design and get it tested and qualified in time to meet Raytheon's contractual deadlines with the U.S. government.  *See* Trial Exhibit 58 (Raytheon acknowledging, in August of 2017, its "reliance on RBC" until it can get the bearings from another source).  Thus, if Raytheon did not effectively hand RBC's competitors the trade secret design for the subject rod end bearing, RBC would have obtained an LTA to produce these critical parts.  Or, at a minimum, RBC would have been the only source to supply the rod end bearings through at least April 2023—just like the company that replaced RBC (Eltronics) has been.

RBC will establish, through its damages expert, that but for Raytheon's misappropriation, RBC would have made at least $1,917,933 in profits.  *See* Dkt. Entry No. 209-2, p. 4.  Thus, RBC is entitled to that amount of damages.

### v.        Willful and Malicious Misappropriation

"[E]xemplary damages and attorneys' fees are available where the misappropriation was 'willful,' i.e., done with actual or constructive knowledge of its probable consequences, and 'malicious,' i.e., done with intent to cause injury."  *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 2024 U.S. Dist. LEXIS 65395 *27-28 (Apr. 10, 2024).  RBC can prove Raytheon's intent to

cause injury through direct evidence that shows Raytheon's ill-will, or through indirect evidence that suggests that Raytheon acted with ill-will. *KPM*, supra at *28-29.

The evidence will show that in 2015, when Raytheon received the Bubble Drawing from RBC, Raytheon was put on notice that McNeil's redesign of the rod end—which was handwritten on the drawing in compliance with the marking requirements of the PIA—were proprietary to RBC. *See* Trial Exhibit 6. The Raytheon employee that received the Bubble Drawing, Chris Remy, did not process it through Raytheon's legal department despite the clear proprietary and confidential markings and an explicit reference to the PIA, or otherwise take steps to treat the design as RBC's Proprietary Information. Remy never informed anyone at RBC that he and Raytheon did not consider McNeil's design changes to be RBC's Proprietary Information. He took no steps directly with RBC to challenge McNeil's claim to the design as RBC's Proprietary Information. Instead, Remy made the determination himself that McNeil's drawing did not contain any trade secrets or proprietary information and disregarded RBC's claim of ownership. At a minimum, Remy should have known that the Bubble Drawing should be sent to the legal department and that the failure to do so would result in harm to RBC's intellectual property rights. Raytheon is no stranger to dealing with confidential and proprietary information. Raytheon then incorporated RBC's Proprietary Information into its drawing for the rod end bearing.

Raytheon then, to save money at RBC's expense, misappropriated RBC's trade secret in or around May 2016—by sending Multicut RBC's trade secret rod end design without informing Multicut that it contained information proprietary to RBC and without having any NDAs with Multicut in place to protect RBC's Proprietary Information—Raytheon knew or should have known that this disclosure and omission of critical information would result in harm to RBC's intellectual property rights. Namely, without informing Multicut that the design came from RBC,

Multicut would perceive Raytheon as the owner of the design with authority to waive any protections of the design.   Thus, when Raytheon subsequently instructed and/or expressly approved of Multicut shopping around a drawing containing RBC's trade secret design to find a cheaper supplier, Multicut could have perceived (and apparently did perceive) Raytheon as having authority to authorize the same.   Indeed, that is the response Multicut gave when RBC informed it that it had been misappropriating RBC's trade secret by shopping it around to RBC's competitors. *See* Trial Exhibit 49 (Multicut employee says: "I have sought other bids in **full agreement** with Raytheon – based on drawings that are proprietary to Raytheon.") (emphasis added).

Raytheon's conduct after Multicut informed Raytheon that RBC was claiming misappropriation of its trade secret rod end design further establishes Raytheon's willful and malicious intent.   For instance, in July of 2017, after RBC informed Multicut that it had been misappropriating RBC's trade secret design, Raytheon forwarded the RBC/ Multicut correspondence internally and only analyzed the misappropriation claim as to RBC's sleeve bearings—not as to RBC's rod end bearings. *See* Trial Exhibit 51.   Raytheon knew or should have known that failing to conduct an analysis of RBC's trade secret claim as to the rod end bearing design would result harm to RBC's intellectual property rights.   Specifically, it would mean that Multicut and Raytheon would continue to use and misappropriate RBC's trade secret rod end design.   Instead, Raytheon falsely assured Multicut that RBC owned nothing in the rod end design and that the drawing contained only Raytheon confidential and proprietary information.   Based on these false assurances, Multicut continued seeking a second, cheaper source for the rod ends utilizing RBC's misappropriated Proprietary Information.

In addition, in June 2017, Raytheon offered to disclose RBC's proprietary rod end bearing design to RBC's competitor NHBB. *See* Trial Exhibits 45 and 111.   This is a clear indication that

Raytheon had no intention of honoring RBC's rights to the trade secret rod end bearing design. Such a disclosure would be directly contrary to the purposes in the third WHEREAS clause of the PIA (*i.e.*, not authorized by RBC in writing, not for the purposes of a business relationship with RBC, and not for proposals to RBC).  In addition, under PIA ¶ 6(b), Raytheon would have also had to have NHBB undertake "written obligations to protect [RBC's] proprietary information" and at that point Raytheon was maintaining that it—not RBC—was the owner of the trade secret rod end bearing design.

In or around August 3, 2017, Raytheon was again reminded that RBC has intellectual property rights in the design for the rod end bearing.  *See* Trial Exhibit 52.  Nevertheless, Raytheon continued to use and misappropriate RBC's trade secret rod end design for its own benefit.  Again in October 2018, after RBC sued Multicut, Raytheon was given another opportunity to acknowledge RBC's ownership of the rod end bearing design.  *See* Exhibit 1.  Specifically, Multicut sent Raytheon an email requesting "written confirmation" that "Raytheon is the rightful owner" of the rod end design and that "Multicut can ask any source for this part[]."  Trial Exhibit 1.  Raytheon responded by again falsely asserting ownership over the rod end bearing design and stating that Multicut can purchase the parts from any vendor that meets the requirements.  *See* Trial Exhibits 1, 236, and 241.  Raytheon knew or should have known that claiming ownership over RBC's trade secret rod end design would cause injury to RBC.

In addition, Raytheon's internal emails confirm that it was fully aware that Multicut had sent around RBC's trade secret rod end design to RBC's competitors to find a cheaper price, and Raytheon was excited about this.  *See* Trial Exhibit 46 (Raytheon internal messages in June 2017); Trial Exhibit 292 (Raytheon internal email in August 2017 stating "long story short, Multicut competed [the bearings] and all the other bids were $20+ lower than Heim's $65 part….").  In fact,

Raytheon was directing Multicut's conduct[14] and strategically sending certain messages to RBC through Multicut.  *See* Trial Exhibit 55 (Internal Raytheon message stating "applying the frank [Multicut] filter results in a softer message from them [RBC]").  Raytheon itself sent an email to one of RBC's competitors soliciting quotes for RBC's trade secret rod end bearing.  *See* Trial Exhibit 45.  Raytheon was also levering its size and power and exerting pressure on RBC to provide rod end bearings without an LTA in place, despite knowing that doing so would injure RBC's business interest.  *See* Trial Exhibit 52 (Multicut relays to Raytheon that RBC's position is that it "has invested heavily in engineering and proactively to build an inventory position to provide accelerated lead times on this program" and has "no interest in spot-buy purchase order supply without a long-term contractual agreement."); Trial Exhibit 54 (August 8, 2017 internal Raytheon message stating: "At noon I'm going to call RBC to try and encourage them to accept Frank's PO while they discuss the LTA.  Let them know they are a top risk for the program right now.  I'm going to play nice at this point and try to get the hardware[.]  If they won't play nice I'm going to ask if they'll sell us 500 sets.").

Raytheon's willful and malicious intent is further highlighted by its deliberate and culpable choice to assist Multicut in stringing RBC along on the LTA negotiations from May 2017 through January 2018, until Multicut could obtain the rod end bearings from a second source.  *See e.g.*, Trial Exhibit 58 (Raytheon internal email in August 2017 saying "Multicut has bearings on order from a second source that will arrive at the end of October.  They are investigating making the rod ends on their own.  This should alleviate our **reliance on RBC.  We are still concerned that RBC**

---

[14] *See* Trial Exhibit 272 (Raytheon's "Multicut Path Forward" presentation instructing that at a meeting on April 26-27, 2017 Multicut should expect to make decisions in the room to reduce cost of parts); Trial Exhibit 61 (Raytheon instructing Multicut to "inform the previous supplier that… [sic] you will not be moving forward with them….").

**may tell us to pound sand** on the 50 they agreed to sell **if they get confirmation that the business is leaving.**" (emphasis added)); Trial Exhibit 298 (RBC emails Raytheon about how Multicut is dragging its feet on the LTA negotiation and Raytheon plans a meeting to discuss); Trial Exhibit 126 (showing slow progress of negotiations); Trial Exhibits 120 and 121 (Raytheon organizes June 2017 conference calls between Raytheon, Multicut and RBC to discuss supply of rod ends and negotiations of a LTA). Raytheon knew that stringing RBC along in order to get the parts it needed would cause financial injury to RBC. The whole point of the scheme was to deprive RBC of sales of its trade secret rod end bearing by finding a cheaper source of supply.

Raytheon knew or should have known that handing RBC's trade secret rod end design to RBC's competitors in order to secure a lower price for itself would cause financial injury to RBC. Likewise, Raytheon should have known that pressuring RBC to continue to supply rod end bearings, when it had no intention to use RBC long-term, would result in financial injury to RBC. Raytheon's role throughout this process reflects a sheer disregard of and lack of respect for RBC's claim of ownership over the rod end design.

### III.        Breach of Implied Covenant of Good Faith and Fair Dealing

RBC also claims that Raytheon breached the implied covenant of good faith and fair dealing. Every contract contains an implied covenant of good faith and fair dealing between the parties to a contract. *See Dooling v. James B. Nutter & Co.*, 139 F. Supp. 3d 505, 514 (D. Mass. 2015). The implied covenant of good faith and fair dealing means that neither party may do anything that will have the effect of destroying or injuring the right of the other party to receive the benefits of the contract. A party may breach the covenant of good faith and fair dealing without breaching any terms of the contract. To prove its claim, RBC is not required to show bad faith. Instead, RBC has to prove that Raytheon lacked good faith. Evidence that Raytheon behaved

unreasonably under the circumstances indicates a lack of good faith.  The core question is whether Raytheon's conduct was motivated by a desire to gain an unfair advantage or otherwise had the effect of injuring RBC's right to the benefits of the PIA.

Here, as set forth above regarding Raytheon's willful and malicious conduct, the evidence will show that Raytheon desired to gain an unfair advantage—by disseminating RBC's trade secret rod end design to companies who could charge a lower price than RBC because they had not invested time, resources, or energy into inventing the design—in order to cut its own costs.  This conduct had the effect of injuring RBC's rights to the benefits of the PIA.  Namely, under the PIA, RBC had the right to expect that any information it disclosed to Raytheon, and marked as proprietary to RBC, would be kept confidential by Raytheon.  *See* Trial Exhibit 65 ¶ 3(a).  RBC had the right to expect that Raytheon would not assert ownership over information that RBC designated as proprietary to RBC.  *See* Trial Exhibit 65 ¶ 8.  RBC had the right to expect that Raytheon would not disclose information that RBC designated as proprietary to vendors or subcontractors unless (1) the vendor or subcontractor undertook a written obligation to protect RBC's proprietary information; **and** (2) the disclosure was in connection the purposes specified in the contract—that is, for a purpose that benefits RBC.  *See* Trial Exhibit 65 ¶ 6(b)(iii).  Also, RBC had the right to expect that Raytheon would only use information that RBC designated as proprietary to RBC for the purposes specified in the contract—that is, for a purpose that benefits RBC.  *See* Trial Exhibit 65, RBC00011.

Raytheon deprived RBC of all of these rights under the PIA, and it did so with the express purpose of cutting its own costs at RBC's expense.

## IV.   <u>Declaratory Judgment Under 28 U.S.C. § 2201</u>

RBC seeks a declaratory judgment from the Court in the event the jury rules in its favor on its trade secrets claims.  Specifically, RBC seeks a declaratory judgment that the designs, drawings, pricing data and all other documents relating to the proprietary rod end bearings designed by RBC are the trade secrets of RBC protected under both the DTSA and M.G.L. c. 93, § 42 et. seq.

## PENDING MOTIONS AND REQUESTED RULINGS

1. RBC's motion in limine to preclude evidence of Raytheon's damages expert (Doc. No. 216).

2. RBC's motion in limine to preclude evidence of Raytheon's Purchase Order Standard Terms and Conditions (Doc. No. 217).

3. RBC's motion in limine to preclude opinion of Raytheon's technical expert related to obviousness of the combination of RBC's rod end bearing design features (Doc. No. 218).

4. RBC's motion in limine to preclude opinion of Raytheon's technical expert related to vendor item control drawings (Doc. No. 219).

5. RBC's motion in limine to preclude opinion of Raytheon's technical expert related to reverse engineering (Doc. No. 220).

6. Raytheon's motion in limine to preclude evidence concerning its joint defense agreement with Multicut (Doc. No. 204).  RBC asks the Court to deny this motion for the reasons set forth in its opposition (Doc. No.  239).

7. Raytheon's motion in limine to preclude evidence of Raytheon's size or finances (Doc. No. 207).  RBC asks this Court to deny this motion for the reasons set forth in its opposition (Doc. No. 248).

8. Raytheon's motion in limine to preclude evidence of damages after the issuance of RBC's first patent on a rod end design containing some—but not all—of RBC's trade secret design (Doc. No. 211).  RBC asks this Court to deny this motion for the reasons set forth in its opposition (Doc. No. 254) and its surreply (Doc. No. 263).

## RBC's WITNESSES

RBC expects to call the following witnesses at trial:

1. Ken Giuntoli

2. Scott McNeil
3. Robert Adams
4. John Andrup (through deposition designations)
5. John Willett (through deposition designations)
6. Chris Remy
7. Frank Duhring (through deposition designations)
8. Steve Bliss
9. Ian Bealer (through deposition designations)
10. Chris Spadea
11. Ben Anderson (rebuttal, if necessary, through deposition designations)

## ISSUES TO DISCUSS AT PRE-TRIAL CONFERENCE

1. Trial time split. Times for openings and closings.

2. RBC will be resubmitting an updated combined exhibit list and exhibits in advance of trial.

3. Deposition designations, objections, format and presentation.

4. Raytheon's motions to impound with respect to the key drawings in this case.

5. Stipulated facts.

DATED:  August 16, 2024                    THE PLAINTIFF,

                                           ROLLER BEARING COMPANY OF
                                           AMERICA, INC.

                             By:    _/s/ Julie A. Lavoie_____
                                    Lorey Rives Leddy (PHV)
                                    Richard J. Basile (PHV)
                                    James F. Radke, BBO# 667299
                                    Daniel J. Krisch (PHV)
                                    Julie A. Lavoie (PHV)
                                    MURTHA CULLINA LLP
                                    107 Elm Street, 11th Floor
                                    Stamford, CT 06902
                                    Tel: (203) 653-5400
                                    lleddy@murthalaw.com
                                    rbasile@murthalaw.com
                                    jradke@murthalaw.com

dkrisch@murthalaw.com
jlavoie@murthalaw.com

Denise L. Plunkett, BBO# 568133
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street New York, NY 10036
Tel: 212-728-2231
Fax: 212-728-2201
dplunkett@axinn.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 16, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system [or by mail to anyone unable to accept electronic filing].  Parties may access this filing through the Court's system.

Elizabeth A. Alquist
Woo Sin Sean Park
Emily Ferriter Russo
DAY PITNEY LLP
242 Trumbull Street
Hartford, CT 06103
eaalquist@daypitney.com
wpark@daypitney.com

Jonathan I. Handler
DAY PITNEY LLP
One International Place
Boston, MA 02110
jihandler@daypitney.com

/s/ *Julie A. Lavoie*
Julie A. Lavoie